JOSEPH DeMARCO, an Infant, by ANTONIO DeMARCO, His Guardian ad Litem, Plaintiff, *v.* WILLIAM SEAMAN, Defendant.

STANLEY EMMER, an Infant, by His Guardian ad Litem, KATHERINA EMMER, Plaintiff, *v.* THE ARBEE RENTING CORPORATION and Another, Defendants.

JOHN IGOE, an Infant under the Age of Fourteen Years, by CHARLES IGOE, His Guardian ad Litem, and Another, Plaintiffs, *v.* MARTIN A. VAN BEERS, Defendant.

HERBERT BORMANN, an Infant, by HENRY BORMANN, His Guardian ad Litem, Plaintiff, *v.* JESAJA PAIS and Others, Defendants.

In the Matter of the Application of LOUIS LOPEZ, Guardian ad Litem, to Withdraw Money for Expenses for JOSEPH LOPEZ, an Infant.

DOMINICK CARIDI, an Infant, by JOSEPH CARIDI, His Guardian ad Litem, and Another, Plaintiffs, *v.* DANIEL REEVES, INC., Defendant.

THOMAS W. FARRELL, an Infant, by THOMAS F. FARRELL, His Guardian ad Litem, Plaintiff, *v.* WALTER GEBANDE, Defendant.

MARY CASSON, an Infant, by MARY CASSON, Her Guardian ad Litem, and Another, Plaintiffs, *v.* BUSHWICK HOUSEWRECKING Co., INC., and Another, Defendants.

JOHN ALLGAIER, an Infant, by TONY ALLGAIER, His Guardian ad Litem, Plaintiff, *v.* IRVING STOLZENBERG and Another, Doing Business under the Firm Name and Style of STOLZENBERG BROS., Defendants.

Supreme Court, Queens County, August 7, 1934.

Attorneys moved *ex parte* over a long period and opinion is filed without appearances in interests of justice.

CUFF, J. Applications by guardians *ad litem* have been made to withdraw what is commonly known as " infants' funds." Perhaps it would be well to remind ourselves of the history of the money on deposit. In each instance an infant was injured. Two actions were instituted. The infant was awarded money to compensate him for his pain, suffering and incapacity resulting from the injury. The parent was reimbursed for the moneys he had expended for cure, was compensated for any loss of the infant's services he had already sustained, and was given an estimated amount to repay him for such loss in the future. If juries or the court assessed the damages two judgments were entered. If the cases were settled, one amount was allowed " for the infant's action " and another amount " for the loss of services action."

The court has full control of the money allotted to the infant. It has nothing to do with the parent's recovery. The infant's money must be deposited (in New York city) with the chamberlain. There it is held, subject to order of this court, until the infant attains his majority, when it should be delivered to him. On that day, the infant's twenty-first birthday, this court, in a leg-off case for example, in effect, says: " You were injured in an accident solely because of the negligence of another, many years ago. Your leg was amputated. In this civilized world, under such circumstances, the injured person is afforded an opportunity to appear before a jury to be compensated for such injury. That was done in your case. After your attorney was allowed a sum by the court for his services, there remained of the jury's verdict $ . . . . . . . . The law required that this money be deposited with the Chamberlain of the City of New York to be held by him, earning income for you until today. That was done. When judgment was entered you were a child, not capable in law to manage your own funds. You were provided with a guardian — the best guardian that could be found — the Supreme Court of the State. You are a helpless cripple today. Your father is relieved of his obligation to support you. You must strike out for yourself. Your right to enter the race of the survival of the fittest today on even terms with all others of the

same age is recognized.   This state because of its laws and courts, has substituted for your amputated leg a sum of money — the amount reserved for you by the jury's verdict in your case.   That money preserved by the fiscal officer of the City of New York, has been kept intact by your guardian — the Supreme Court.   Here it is — every penny of it — with the earned income.   The state has discharged its duty to you.   All that could be done for you has been done."

That depicts vividly for emphasis the origin and theoretical disposition of this money now sought to be withdrawn in various amounts for various reasons.

But a practice has developed in our courts which renders those assuring words of the court an empty gesture.   Under the pretense of " dire need " infant deposits can be whittled away.   Parents seek these moneys " to buy necessaries for the infant."   Many are the reasons advanced and the money (it seems to be the custom) is parcelled out in $100 and $150 allotments.   No one takes the trouble to ascertain what is actually done with the funds.   All that is known is that the petition states that someone expects to spend it for the benefit of the infant.   Unused sums are never returned. There is no accounting.

Consider the foregoing supposititious case and imagine the Supreme Court, instead of presenting the twenty-one year old young man with a check to take the place of his amputated leg, handing him a paper showing a list of withdrawals revealing the sad story that all the money is gone.   To pursue the fiction, the young man should declare: " You say that the money for my injury was used to purchase necessaries for me.   My father was reimbursed for what he spent to cure me.   He even received money representing loss to him of my earning power.   Other infants, possessing no ' injury funds ' have been supported by their fathers.   Did not the law place the obligation of supporting me during my minority upon my father?   Why was I called upon to support myself?   You were my guardian.   None of this money could have been withdrawn without your order.   Did you not realize that I would have to face the world beginning on my twenty-first birthday — today — without aid from my father and make my way alone?   How do you expect that I can exist in my crippled condition without capital to take the place of my normal body?   Why did you — my protector, given to me by law — permit my funds, awarded by a jury for a specific purpose, to be diverted and dissipated?   Who represented me on those withdrawal applications?   I was born normal.   Through no fault of mine I am a cripple.   I was given money to take the place of my leg.   Today I have no leg; I have no money."

If infants are the wards of the Supreme Court, why do we not protect their funds in fact instead of merely in theory? Signing orders submitted is not faithfully discharging the trust reposed in the court. Neither lawyers, litigants nor judges seem to have any fixed or definite ideas on this important subject. Surely, no one could subscribe to some of the reasons for withdrawals set forth in the applications submitted to me, while I have been sitting in this part (Special Term, Queens county). Let us examine the situation to the end that some rules may be formulated for the guidance of all.

The parent, applying in good faith and supposedly having the infant's interest at heart, actually is the fund's worst enemy. The court ordinarily relies upon a parent. But in this kind of application the frailness of human nature must be recognized. Some people have a mania for spending money today which they are not to receive until a tomorrow and often " tomorrow " for them never arrives. Money to be paid to their child at some future time is like a magnet drawing some parents toward it. They are not dishonest. They harbor no less interest in their offspring. They intend no wrong although they serenely perpetrate a great and usually an irreparable one. The temptation is irresistible. Because of the looseness of the courts in granting these applications, attorneys are unable to dissuade their clients, for these parents can cite numerous instances where favorable consideration has been accorded. It is time that a definite stand be taken. Approving such applications should not be left to the whim of each judge who sits in Special Term, one overruling the other in the same case. Confidence in such a guardian cannot be expected to long endure.

The most appealing, but irrelevant, reasons are characteristically advanced to obtain the release of infant's money. The procedural weakness, however, is that in this attack, except in a purely formal sense, the infant is unrepresented. There is no opposition. There is no appeal. When the order is signed the money is gone forever and spent without trace. The Supreme Court has assumed the duty of protecting the funds of infants, who are the State's most precious possession. No statute imposed such duty. It was natural for the court to assume that control and it did. The right so to act is inherent in the court. (*Losey* v. *Stanley*, 147 N. Y. 560, 569.)

The underlying reason assigned for withdrawing funds is the lack of income in the family of the infant. Unemployment occasions want. The family looks for funds. The only money they know of is the infant's. It seems logical to them to take part of it. The parent swears that the money is to be used to buy necessaries for the

infant. A sum is ordered to be withdrawn. With funds at their finger tips the family is forced, by necessity, to decide that it is only just to use some of this money to provide others in the household with the necessaries that they require.

Occasionally a large amount is requested to send the infant to a camp in the country. Some of the June applications requested money, usually fifty dollars, " for the infant's graduation " from elementary or high school.

Consider the underlying reason first — the lack of funds in the family exchequer — and assume that it is true. The infant's money was awarded to compensate him for *his* pain, *his* suffering and *his* incapacity occasioned by the accident — not to purchase necessaries for him during his minority. The law obligates the father to provide those necessaries. If he fails in this duty, those agencies should act that provide necessaries for infants without such funds. I am not dealing with infants who possess inheritances but with crippled children each of whom happens to have a small sum of money in place of a normal body. Today taxpayers are contributing huge sums to be used for the relief of the distressed. No exception is reserved by the taxpayer to withhold financial aid from the families of these unfortunate children or from the children themselves. The relief is for all who are deserving. It happens that the sting of unemployment produces want that leads parents in desperation to look longingly toward their crippled child's money. They withdraw from the " injury money." They withdraw again and again. Soon the fund is exhausted. Assume that they attained the temporary relief desired, the price they paid was that they " spent " their infant child's amputated leg. I do not think that any one is willing to concede that distress in this State has degenerated to that low level.

At the time of the trial the jurors were perhaps told that the money assessed against the defendant would be kept for the infant until he became twenty-one. They were not advised that if unemployment visited the infant's home this money would be appropriated to support the infant. If that is a proper expenditure to make now, the jury should have been charged to that effect and evidence received showing the likelihood or unlikelihood of such unemployment happening. Who will say the verdict would have been in the same amount under such a charge and in the face of such proof?

Following is a typical charge at a trial where the infant's injury action and the father's loss of services action are tried together:

" If entitled to recover, the father in his action is entitled to recover such financial losses as you find he sustained as a result of

the accident. The father is required to bring the boy up and be responsible for his upbringing during his minority, and is likewise responsible to bear the expense thereof during that period. At the same time, he is entitled to the services of the boy during his minority, and to the boy's earnings during that period. Upon this basis, and this basis alone, you are to determine what damage if any the father sustained.

" As to the damages in the boy's action: In the boy's action, provided you find plaintiff entitled to recover, you are to consider the boy's age and condition in life, the bodily injury sustained, his pain and suffering, and you should also take into consideration such damages as he may sustain by reason of the nature of the injury, which in this case is conceded to be permanent." (*Madden* v. *Chalmers*, App. Div. Records, First Dept. vol. 1365, p. 107. For reported case, see 215 App. Div. 549.)

The proceeds of a verdict for an infant in such case can no more properly be diverted to another purpose than they could be given to another person. When that money is withdrawn to purchase necessities, it is being misapplied.

Assuming further that the statements of facts advanced as the bases of these applications are true and accurate, the objection still survives that such money cannot properly be utilized to send the infant to camp or to the country, unless the child's condition resulting directly from the accident demands such treatment. As to graduation expenses — that is answered by a question — what would the family have done if the infant had not been injured? Because the money is available, someone feels obliged to trump up an excuse to spend it. Not many of us would toil if money could be had merely for the asking. There are instances when we must be protected against our own weaknesses.

Can this money be used at all? The answer is " Yes," for certain very limited purposes, which do no violence to the reason for which the fund was created. An expenditure for higher education is no unwarranted invasion against the commitment under which the money was deposited. In fact, it is in strict conformity with that commitment. No father is required to send his child to college. His statutory obligation to furnish education ceases before that stage is reached. The money awarded to the infant is not only to compensate him for the incapacity he will suffer resulting from his injuries, but it was awarded in that particular amount to the end that he may more readily cope with new conditions reasonably expected to arise occasioned by his infirmity. Higher education may take the place of that injured member of his body. If the parent has not the means and the infant would lose the additional

training, the funds may be used to provide higher education. It will serve to place these cripplied infants on a footing more nearly equal with those of sound bodies and that is one of the purposes for which the money was intended.

Again, if the infant became seriously ill, requiring unusual medical care — an operation, for instance, which if it were not performed would further incapacitate him, or if he required treatment of his teeth or eyes, which, if neglected at this time would cause serious trouble in later years — upon clear proof that the parent could not afford these monetary outlays, the funds on deposit should be available for those uses. The award was made to the infant having in mind that his deformity would be none other than the one complained of at the time of the trial. The use of a part of this money for reasons that would prevent further handicap would be in complete harmony with the purpose which brought the fund into existence. An expenditure should be made for further treatment of the injury that the infant sustained because the jury's award included an assessment for that purpose.

After long deliberation, I can think of no other valid reasons of justifiably drawing against such moneys.

Little that is reported has been written on this subject, but the trend of opinion has been to restrict withdrawals. Mr. Justice BENEDICT, denying an application (*Matter of Phillips*, N. Y. L. J. Dec. 2, 1918, p. 726), said, in part: " there is substantial reason why the application should not be granted. It is that the father has already paid out the several sums referred to in the petition, and is now seeking reimbursement of his outlays. It was his duty to furnish these necessaries to his infant son out of his own and not out of his son's money. The infant is now sixteen years of age. Upon attaining his majority he ought to receive the entire amount of the damages and not merely some receipts from his father in lieu of moneys which were paid on account of the injuries sustained by the infant. Application denied."

In a decision appearing November 26, 1917 (*Ulmer* v. *Terry & Tench Co.*, N. Y. L. J. p. 641), the same justice of this court wrote: " this money does not constitute — as many clients and some attorneys seem to think — a fund to be used for clothing, maintenance and support of the infant, and it certainly does not constitute a supplementary source of supply for the parents designed to relieve them from their primary duty to support their offspring. There is far too much lax generosity in some courts with regard to these applications. It is a mistaken kindness to infants to hand over their funds to their parents before majority and at majority

to hand over to the infants merely a bunch of receipts for their dissipated fortune."

Other justices of this district have made similar unreported observations and have declined to sign orders.

The Supreme Court should not blindly hand out money even for the limited purposes above mentioned. Round sums should not be given. What trustee would receive this court's benediction who doled out the money under his control in $100 and $150 allotments? When permission is granted to expend money for the purposes cited, there is no reason for turning over the money to the guardian *ad litem* or parent. That is lost motion which might mean lost dollars. Unnecessary temptations should always be avoided. The court should supervise the spending and order, upon proper proof, that the chamberlain disburse the exact amount directly to the creditor. An account of these expenditures should be maintained in the clerk's office, so that, as in the case of any trustee, upon demand or at the conclusion of the guardianship, the infant may have a statement carefully itemized giving him information upon which to base an inquiry to determine the truthfulness and accuracy of the account. That the money was properly and correctly disbursed should not be taken for granted simply because the guardian is the Supreme Court. Under the guidance of Mr. Justice BROWER, who presides over Special Term, Part VI, Kings county, where such applications are made in that county, a system of such accounting is in vogue now, which should be inaugurated in the other four counties of this district.

There is one more feature that may properly be dealt with at this time. The application should be painstakingly prepared because of its nature. The exercise of care commensurate with the importance of the matters concerned has not been universal in the past. In fact " haphazard " would characterize many of the applications submitted.

The petition should contain a full explanation of the reason for the withdrawal and the sworn statement by a qualified person of the estimated cost of the proposed expenditure. I would recommend that, where time was not of the essence, at least two estimates be filed. The reason for this is twofold, *first*, to put it bluntly, collusion in such matters is not completely unknown to the court and the more estimates obtained the fewer would be the opportunities for such foul practices, and, *second*, no stone should be left unturned to preserve every penny of the funds of these infants. The application should show also the infant's age; the date when and amounts recovered respectively by the infant and parent; the amount on hand and the earned income; a recital of any previous

withdrawals, giving the reasons; the financial circumstances of the infant's family and a statement that the expenditure cannot be afforded by the family; the nature of the infant's injury and his present state of health together with any other facts material to the application.

The practice above suggested includes precautions essentially similar to those imposed by rule 293 of the Rules of Civil Practice. That rule relates, generally, to estates of infants, but reasoning from its genesis, special rule 13 of the New York County Surrogate's Court, rule 293 probably applies only to applications for the withdrawal of funds accruing to the infant by inheritance, testamentary disposition or gift *inter vivos*. It seems that application of special rule 13 was extended generally to the Supreme Court and Surrogate's Court merely by its inclusion in the Rules of Civil Practice as rule 293. There was no enlargement of its terms so that it would embrace by its regulations property and funds of infants peculiar to litigation instituted in the Supreme Court.

The moneys which the applications presented to me seek to withdraw are not of the character contemplated by special rule 13, now rule 293 of the Rules of Civil Practice, since by their origin they are limited to particular purposes. If procedural safeguards such as I have referred to are appropriate to applications for withdrawal of infants' funds generally, it is manifest that like precautions are even more indispensable as a condition of permitting resort to moneys virtually earmarked such as are here concerned.

Each application that has been submitted to me is hopelessly inadequate. They fail to disclose the nature of the infant's injury, the present state of his health, or the amount, if any, awarded in the " loss of services action." The reasons given for the expenditures — where definite reasons are given at all — are such as were never contemplated as a cause for withdrawing the infant's money when the verdict was awarded. These applications being improper in form, or lacking in substance, must be denied. Further applications made in these cases will conform to the procedure set forth in this memorandum.