OPINION OF THE COURT
Douglas E. McKeon, J.
The above-entitled obstetrical medical malpractice action, brought on behalf of Miles Mendez (the infant) by his mother Melina Mendez, was settled before the undersigned for $5,500,000 and an infant’s compromise order was recently executed. This decision discusses the court’s application of the New York State Medical Indemnity Fund (the Fund, the - statute) and the method by which the settlement was allocated.
In the parlance of medical malpractice lawyers, this is a “baby case.” It concerns claims that medical personnel at New York and Presbyterian Hospital (Presbyterian), confronted with non-reassuring labor developments, failed to timely perform a cesarian section subjecting the infant to hypoxia and causing, say plaintiffs, the infant’s cerebral palsy (actually, there is also a claim of an alleged negligent use of forceps that caused traumatic injury to the child). The parties agree that the settlement is subject to the provisions of the Fund, which was enacted, according to its declared legislative purpose, “to reduce premium costs for medical malpractice insurance coverage” (Public Health Law § 2999-g).
To achieve that goal, the statute relieves defendants, in certain specified obstetrical malpractice actions, from paying the future medical expenses component (Fund damages) of any post-April 1, 2011 judgment or settlement, mandating instead that “qualified plaintiffs” be enrolled in a program (i.e., the Fund) which pays for medical expenses as incurred (Public Health Law § 2999-j [6]). The statute also contains a collateral *737 source provision which requires qualified plaintiffs to use private insurance before resorting to the Fund (see Public Health Law § 2999-j [3]).
Prior to the enactment of the statute, insurers or self-insured medical providers customarily settled obstetrical malpractice actions, including claims for future medical expenses, with upfront lump-sum cash. This required prepaying for future medical expenses with the obvious shortcoming that, if a child died sooner than expected, or required a level of future care less than projected at the time of the settlement, unspent or surplus funds went to the child’s estate or for nonmedical uses rather than being returned to the insurer or medical provider. The Fund eliminates this scenario by paying only for those services actually utilized, a method that should significantly reduce the cost of providing future medical care to qualified plaintiffs. The notion that the payment of future damages should have some temporal relationship with the future, not exclusively with the present, is consistent with CPLR article 50-A, about which the Advisory Committee on Civil Practice wrote: “The legislative history indicates that the provisions were intended to avoid payment of unwarranted, ‘windfall’ damages and to thereby reduce the liability costs of the defendants found liable, but without depriving victorious plaintiffs of fair compensation.”[1]
Under the statute the Fund pays for the following:
“future medical, hospital, surgical, nursing, dental, rehabilitation, custodial, durable medical equipment, home modifications, assistive technology, vehicle modifications, prescription and nonprescription medications, and other health care costs actually incurred for services rendered to and supplies utilized by qualified plaintiffs, which are necessary to meet their health care needs as determined by their treating physicians, physician assistants, or nurse practitioners.” (Public Health Law § 2999-h [3].)
For actions covered by the statute, payments of future medical expenses by the Fund are obligatory and courts are required to amend “settlement agreements” or judgments to comply with its terms (Public Health Law § 2999-j [6]). The Fund, which is capitalized by deposits from the State and assessments *738 on obstetrical revenues of New York hospitals, became operational on October 1, 2011. Rules and regulations have been promulgated (and recently published) to implement and amplify the statute’s legislative purpose.[2]
The Fund, which is to be administered by the Department of Financial Services (formerly the Department of Insurance), defines a birth-related neurological injury as follows:
“an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation or by other medical services provided or not provided during delivery admission that rendered the infant with a permanent and substantial motor impairment or with a developmental disability ... or both. This definition shall apply to live births only” (Public Health Law § 2999-h [1]).
Under the statutory scheme, a case is settled, as it was prior to the enactment of the Fund legislation, usually for a lump sum, to wit $5,500,000 in this case. Plaintiffs’ counsel’s attorney’s fee is calculated, pursuant to Judiciary Law § 474-a, on this amount (Public Health Law § 2999-j [14]). Based on the calculations in this action, the fee amounts to $700,000. However, unlike other medical malpractice actions, a defendant in a Fund case pays a portion of the attorney’s fee. Damages, other than future medical expenses, are paid with lump-sum cash.
As will be explained infra, the amount of non-Fund damages (i.e., the damages to be paid in cash) is determined by an allocation of the lump-sum settlement. The allocation also determines how much of the attorney’s fee is paid by defendant. Under the statute, defendant pays that portion of the fee allocable to Fund damages and plaintiff is responsible for the remainder (Public Health Law § 2999-j [14]). In this action, the parties agreed, with the approval of the court, to allocate the settlement on a 50/50 basis — 50% non-Fund damages, 50% Fund damages.
The allocation process seeks to determine, based on facts known at the time of settlement, the extent to which an award is meant to compensate for future medical expenses distinguished from other categories of damages. As jurists, our interpretive juices naturally condition us to assume that the *739 amount allocated to future medical expenses somehow correlates to the extent of care available to a child under the Fund. Actually, quite the opposite is true.
The Fund is antithetical to the notion that judges, jurors and lawyers are soothsayers who can predict, at the time of trial or settlement, the actual lifetime cost of the child’s future medical needs. Once a child is enrolled, the Fund pays for all covered future medical expenses, even if medical circumstances change requiring more extensive care than was estimated at the time of settlement. Simply said, if a portion of the settlement is allocable to future medical expenses, the child qualifies for the Fund, which in no way limits or places a monetary ceiling on the amount of care to which the child is entitled over his or her lifetime. By way of illustration, if the settlement in this action was allocated 80/20, instead of 50/50, the child would still be entitled to the same benefits under the Fund.
The Underlying Facts
Following a November 30, 2010 physical examination, Presbyterian’s examining pediatric neurologist, Dr. Ingrid Taff, issued a report which concluded that “Miles Mendez is a 16-month old boy with spastic triplegic Cerebral Palsy, microcephaly, and global developmental delay.” Plaintiffs contend that medical personnel at Presbyterian failed to timely deliver the infant plaintiff by cesarean section when confronted with nonreassuring fetal monitor tracings suggestive of a hypoxic event. Plaintiffs further allege that in attempting a vaginal delivery, prior to the tardy cesarean section, forceps were negligently and unsuccessfully used, causing a bleed in the right temporal area of the infant’s brain and a fracture of the right temple. Ultimately, assert plaintiffs, attempts to deliver the infant vaginally were abandoned for a cesarean section but, according to plaintiffs, not before the infant suffered a hypoxic event and traumatic injury. The parties agree that the infant is profoundly damaged, is unemployable and will require custodial care or significant home assistance for the remainder of his fife.
The Fund Legislation
On January 7, 2011, early in his administration, Governor Andrew Cuomo announced the appointment of a Medicaid Redesign Team to find “ways to save money within the Medicaid *740 program” for the 2011-2012 fiscal year.[3] Subsequently, on February 24, 2011, the Redesign Team approved a package of recommendations, including “Proposal 131,” which, inter alia, proposed caps on noneconomic damages for medical malpractice awards and urged the establishment of a “Neurologically Impaired Infant Medical Indemnity Fund,” designed to reduce medical malpractice costs, principally borne by hospitals, for obstetrical claims.[4] Citing estimates by the Greater New York Hospital Association, the Fund was projected to reduce medical malpractice costs to hospitals by 20% or $320,000,000.[5]
The concept of a fund was not a new one. Indeed, on December 1, 2009, Lisa Kramer, President and CEO of Hospitals Insurance Company Inc. (HIC), testified before the New York State Senate Standing Committees on Insurance, Health and Codes and explained the rationale for the creation of a fund:
“In the past five years, inflation in malpractice premiums far exceeded inflation in consumer prices and, more important, the reimbursement hospitals receive for the critical care they provide to the public. By way of example, malpractice premiums for one of our hospitals increased from $53 million in 2005 to $115 million in 2009.
“The single biggest driver of hospitals’ malpractice costs is obstetrics — the delivery of babies. Over 40% of our payments are made in cases involving neurologically impaired infants. Taking into account the malpractice premiums attributable to obstetrics cases, one of our hospitals has calculated that it loses over $8,000 per Medicaid-delivered newborn . . .
“In 2007, I proposed to the New York Medical Malpractice Task Force that the State create a Medical Indemnity Fund to provide all the future medical care that a neurologically impaired child needs and *741 is entitled to receive, while shifting the cost of such care to the entire insurance industry . . .
“In our proposal, we explained that the same level of care currently given to neurologically impaired infants would be provided, but at a substantially reduced cost, because the Medical Indemnity Fund would only pay for care that is actually provided . . .
“According to HIC’s actuaries and underwriters, the Medical Indemnity Fund will allow us to reduce hospital malpractice premiums by 20% on the day the law becomes effective. If the fund were applied retroactively to cases not yet resolved by settlement or trial, the reduction would be between 35% and 40%. No other reform allows such significant and immediate relief for hospitals.”
By 2011, the concerns expressed by Ms. Kramer two years earlier remained the same. According to Crain’s, about “50% of med-mal costs” were due to suits involving neurologically impaired infants.[6] Medicaid was the insurer for an estimated 50% of New York State deliveries and paid the medical costs of a significant number of children affected by neurological impairment, including many who had received a settlement or award in a medical malpractice action.[7] In the Bronx and Brooklyn, Medicaid paid for about 70% of baby deliveries.[8] Hence, the creation of an obstetrical fund was an obvious vehicle by which to achieve the Governor’s dual objective of reducing both Medicaid costs and medical malpractice premiums while, on a human level, providing a lifetime of guaranteed care, geared to obstetrical mishap victims, as well as the comfort which comes to a parent by the knowledge that help will be provided to a handicapped child when mom and dad are gone.
Aside from the savings generated because the fund now pays for expenses formerly borne by Medicaid, there is an additional savings to Medicaid because the Fund obviates the need for a supplemental needs trust (SNT), a statutorily created trust which permits plaintiffs to receive settlement cash yet remain *742 eligible for Medicaid benefits.[9] In the court’s experience an SNT is typically used when a child requires significant future care, yet settlement proceeds are inadequate, usually because the plaintiff has concerns about his or her ability to establish liability and is therefore willing to settle the case for a smaller sum. Under the statute, the Fund pays for the same services as Medicaid. However, unlike Medicaid, no lien is created from the receipt of Fund services (Public Health Law § 2999-j [10]). Thus, the Fund permits a plaintiff to settle an action for up-front cash, buy a house and receive a lifetime of care without encumbering the cash or the house, which is a legal consequence of an SNT.
Allocation
As noted earlier, settlements or judgments governed by the Fund require that damages be allocated between Fund damages (future medical expenses) and non-Fund damages (damages other than future medical expenses). This allocation determines how much lump-sum cash the plaintiff receives and how much an insurer or self-insured medical provider saves because of the Fund’s obligation to assume the future medical expense component of the award.
Typically, jury verdicts take the form of answers to special interrogatories. The special verdict assigns dollar amounts to various categories of damages. Hence, Fund and non-Fund damages are readily ascertainable (even if modified by post-trial motion or appeal). Lump-sum settlements, on the other hand, lack the specificity of a medical malpractice verdict. Thus, in a Fund settlement, the court and counsel must quantify those portions of the settlement which compensate for Fund and non-Fund damages. The provisions of the statute (Public Health Law § 2999-j [14]), relating to the method of allocating the attorney’s fee, deals with this subject. It requires that “the entire sum awarded by the jury or the court or the full sum of the settlement” be “allocated” between Fund and non-Fund damages so that the portion of the attorney’s fee allocated to non-Fund damages is deducted from the non-Fund portion of the award.
Using the subject settlement as an illustration, the following calculations apply:
1. The attorney’s fee is calculated pursuant to Judiciary Law § 474-a (as the statute requires). The fee in this action is $700,000.
*743 2. The non-Fund portion of the settlement (based on a 50/50 allocation) amounts to $2,750,000 (50% of $5,500,000).
3. From the non-Fund portion of the settlement ($2,750,000) is deducted that portion of the attorney’s fee allocable to non-Fund damages (50% of $700,000 or $350,000), based on a 50/50 allocation. Thus $350,000 is deducted from non-Fund damages of $2,750,000 and plaintiff receives $2,400,000 in cash and enrollment in the Fund.
4. The balance of the attorney’s fee allocable to Fund damages (50% of $700,000 or $350,000) is paid by the medical provider or insurance company.
Under the literal terms of the statute, the allocation occurs after the parties agree to a settlement amount; in reality, the allocation and settlement amount are discussed at the same time. As a general rule, the existence of the Fund is not supposed to increase the amount of the settlement. In other words, an action settled pre-Fund for $4,000,000 should settle for $4,000,000 today. One evolving exception to this rule involves limited policy settlements. By way of example, an action worth $5,000,000 with $3,000,000 in available coverage would ordinarily settle pre-Fund for $3,000,000 or $2,900,000. Today, the same case can be settled under the Fund, assuming a 50/50 allocation, for $4,500,000 while permitting the carrier to save on its $3,000,000 policy limits. The concept was explained in a recent New York Law Journal article about the Fund:
“There will probably be fewer savings recognized by insurers for physicians whose coverage is in the $1-3 million range, since defendants will still be responsible for all past damages, future pain and suffering, future lost earnings, future loss of services, and the plaintiffs attorney’s fee, which will be calculated on the entire amount of the verdict or settlement and paid in a lump sum. In the case of catastrophic injuries, sustainable awards for pain and suffering alone can easily exceed $3 million.
“Yet, there may be benefits for physicians as well in that the existence of the Fund may make it possible for the actual amount paid in settlement to be within the physicians’ coverage. For example, if the agreed-upon settlement amount was $4.5 million and 50% of the settlement was allocated to expenses covered by the Fund, the amount that the defendant would actually have to pay, inclusive of the attorney’s fee, which is allotted proportionately be *744 tween Fund and non-Fund items, would be $2,550,000. This would be within the coverage in the case of a $3 million policy. Accordingly, in this example the fact that the $4.5 million settlement, on paper, was possible meant that the doctor did not have to risk being exposed above his or her coverage” (Goldberg & Lyddane, In Defense of the Medical Indemnity Fund, NYLJ, May 6, 2011, at 4).
It is important to remember that the Fund, by statute, has a built-in suspension mechanism (i.e., no new enrollments) when its liabilities equal or exceed 80% of its assets. In such case, the settlement is enforced as if there was no Fund — the total amount of the settlement prior to allocation.
The 50/50 Allocation in this Case
Generally speaking, the most compelling reason for a substantial offer in an obstetrical case is the “devastating nature of the infant plaintiffs injuries” (Martelly v New York City Health & Hosps. Corp., 276 AD2d 373, 374 [1st Dept 2000]). Indeed, a review of relevant appellate authorities in this area supports the conclusion that, in the case of a profoundly damaged child, future medical care and treatment, especially custodial care or round the clock home assistance is, by far, the most costly element of damages. Several cases illustrate the point. Each involved a profoundly damaged child, requiring custodial care, which resulted in substantial jury verdicts modified on appeal. On the low end of the spectrum is Lovett v Interfaith Med. Ctr. (52 AD3d 578 [2d Dept 2008]), a case involving the delivery of a 12-week premature baby for which future medical expenses accounted for 53.7% of the judgment. On the high end is Flaherty v Fromberg (46 AD3d 743 [2d Dept 2007]), a suit involving a child who suffered devastating injuries, including cerebral palsy with spastic quadraparesis, as the result of an obstetrical mishap. Future medical expenses in Flaherty accounted for a staggering 89% of the damages award. In Manuka v Crenshaw (43 AD3d 886 [2d Dept 2007]), another suit involving a severely brain damaged child, future medical expenses accounted for 62% of the judgment. Manuka is probably a good median of the ratio between future medical expenses and other damages in an obstetrical case where custodial care is required. In Cabrera v New York City Health & Hosps. Corp. (272 AD2d 495, 496 [2d Dept 2000]), the child suffered “bilateral hypoxic encephalopathy, spastic quadriplegia, corticol blindness and mental retardation” as the result of obstetrical malpractice. As *745 modified by the Appellate Division, future medical expenses accounted for 55% of the judgment. Finally, there is the oft-cited Desiderio v Ochs (294 AD2d 241 [1st Dept 2002], affd 100 NY2d 159 [2003]), ironically a nonobstetrical case, involving a damages award for the devastating injuries resulting from the negligent revision of a shunt in a four year old born with hydrocephalus. There, the Appellate Division sustained a reduced judgment (before CPLR article 50-A structuring) of $50,123,293, 93% of which represented damages for future medical expenses, including 76% or $40,000,000 for future custodial care. If determined solely on appellate precedent, the allocation of a settlement in an action involving a child who requires future long-term custodial care must be weighted heavily in favor of Fund damages, surely in excess of the 50/50 apportionment in this case. But the Fund changes the dynamics of the settlement process, requiring courts to combine precedent with a healthy dose of practicality.
The Fund reduces, often substantially, the amount of net cash available to settle a case. While some parents of youngsters who have been the victims of an obstetrical mishap will, hopefully, realize that enrollment in the Fund is a valuable tangible asset, some, undoubtedly, will grouse about the reduced amount of cash which results from a settlement. Potentially, some parents will be disappointed with the outcome and their lawyers will have the difficult task of trying to explain why a guaranteed program of medical services for a child is an appropriate substitute for ready cash.
In smaller value settlements (usually because of liability problems), where a 50/50 allocation is appropriate because of the nature of the injuries, this court has tinkered with its 50/50 allocation. Take, for instance, a $2,000,000 settlement. Applying a 50/50 allocation, plaintiffs will have to pay a portion of the attorney’s fees, leaving a net recovery of less than $1,000,000. Under those circumstances, this court encourages a hospital or insurer to be less insistent on a 50/50 allocation or to take other innovative measures to maximize cash. For instance, in a recent case, a self-insured hospital, above and beyond the settlement, agreed to satisfy the Medicaid lien so that the allocation percentages remained in tact, but cash was maximized.
Speaking of Medicaid liens, Arkansas Dept. of Health & Human Servs. v Ahlborn (547 US 268 [2006]) is particularly applicable, in the view of this court, to a settlement or judgment governed by the Fund. Since the statute reduces the amount of *746 net cash available to satisfy liens (in other words, a Medicaid lien cannot be satisfied on the portion of the judgment or settlement representing payments by the Fund for future medical services as incurred), and Ahlborn requires that Medicaid liens be recouped in the same ratio as past medical expenses bear to the total value of the judgment or settlement, it would seem that an equitable allocation of the lien needs to be made to account for the diminished amount of ready cash actually available to pay the lien.
As we know from past experience, many obstetrical settlements will involve children who will not require custodial care or whose need for future medical services is limited. Thus, the amount allocated to Fund damages will likely be less than 50%. Hopefully, as more courts apply the allocation process to settlements, certain general parameters will be established to deal with differing fact patterns.
Now comes the difficult part: The Fund was created to help insurance companies, hospitals and medical providers reduce premium costs in obstetrical malpractice actions. Thus, if the Fund takes on the obligation of paying for a child’s future medical needs, the statute anticipates an accompanying savings to the class for whose behalf the Fund was created. “Where words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, resort may not be had to other means of interpretation” (McKinney’s Cons Laws of NY, Book 1, Statutes § 76).
The Legislature’s reason for creating the Fund is unequivocally set forth in the statute: “[T]o provide a funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage” (Public Health Law § 2999-g [emphasis supplied]). Distilled to its basics, the statute’s legislative scheme is a simple one: The Fund substitutes services for up-front cash. The Fund pays for the services and the insurer, hospital and/or medical provider saves the up-front cash. This savings reduces the insurer or self-insured medical provider’s cost of resolving obstetrical cases, doubtless resulting in reduced malpractice premiums and/or expenses. Realistically, the amount of savings will depend on the facts of the individual case and there is no “one size fits all” formula.
Since nisi prius courts “are learning to walk” when it comes to applying the Fund to the settlement process of obstetrical cases, each new judicial pronouncement helps to develop a body *747 of decisional law which, when coupled with the recently published regulations, brings clarity and uniformity to a program charged with safeguarding the future of seriously sick children. But, there are other judicial imperatives. Any allocation from a settlement involves more than just plaintiffs, defendants or a court. While not a party or physically present at the settlement table, the Fund is a government administered body, directly affected by settlements which utilize its resources as compensation for future medical expenses. While the welfare of the children, many profoundly damaged for life, must be a court’s first and foremost consideration, this responsibility is not without limitation.
Judges are government officials who “are presumed to carry out their duties in good faith” (Spezzaferro v F.A.A., 807 F2d 169, 173 [Fed Cir 1986]). In that spirit, a court must insist on a “good faith” allocation; in other words, an allocation which satisfies the legislative intent of the statute and generates a savings to an insurer or medical provider appropriate to the facts of the case. Thus, the allocation process cannot be manipulated solely for the purpose of settling a case or enhancing an attorney’s fee. The Fund is a substitute for cash, it is not, however, a supplement to cash. Its purpose is to save, not enrich. Said bluntly, an allocation may not impose the economic burden of a lifetime of care on the Fund’s resources in exchange for a de minimis savings of cash for an insurer or medical provider.
Lastly, enactment of the Fund has stirred controversy; change often does. Undoubtably, the Fund will have to work out its “kinks”; most new programs do. And, yes, skeptics have a right to insist that the Fund meet the needs of a damaged child without subjecting a family to bureaucratic nightmares and snafus. However, at a time when states across the nation confront the fiscal reality that the cost of governance must be reduced, particularly expenses related to health care and Medicaid, the bench and bar must act cooperatively and responsibly to implement a program whose purpose is clear while protecting the sick children who we have the privilege to call our wards.

. Report of the Advisory Committee on Civil Practice, Jan. 2004, at 18, www.nycourts.gov/ip/judiciaryslegislative/civilpractice_04.pdf (accessed on Oct. 30, 2011).

. http://www.health.ny.gov/regulations/emergency/docs/2011-0915_medical_ indemnity_fund.pdf (accessed on Oct. 31, 2011).

. New York State Department of Health, Redesigning the Medicaid Program, http://www.health.ny.gov/health_care/medicaid/redesign (accessed on July 22, 2011).

. New York State Department of Health, Proposals Approved by the New York State Medicaid Redesign Team, Feb. 24, 2011, http://www.health.ny.gov/ health_care/medicaid/redesign/docs/redesign_proposals.pdf (accessed on July 22, 2011).

. Benson, Hospitals get half a fix for medical malpractice woes, Crain’s New York Business.com, Mar. 28, 2011, http://www.crainsnewyork.com/article/ 20110328/FREE/110329874 (accessed on July 22, 2011).

. See footnote 5 (supra), quoting Kenneth Raske, President of the Greater New York Hospital Association.

. Id.

. Id.

. See Kreindler et al., New York Law of Torts § 21.44 (16 West’s NY Prac Series 1997).