OPINION OF THE COURT
David A. Weinstein, J.
This case is before the court on an application for entry of an infant’s compromise order (ICO) approving the proposed settlement of this action pursuant to CPLR article 12. Under the terms of the proposed ICO, the costs of claimant’s future medical care and other qualifying costs would be paid for out of the New York State Medical Indemnity Fund (the MIF or Fund), established in chapter 59 of the Laws of 2011. The proposed ICO states that the action has been compromised in the amount of $4,000,000, consisting of $2,000,000 in damages for past pain and suffering, and $2,000,000 in “Fund damages.” Of the pain and suffering damages, $915,359.88 will be deposited in the Hudson Valley Bank, N.A., to fund a managed settlement trust, and $800,000 will be used to fund periodic structured settlement payments, while the remainder will pay attorneys’ fees and costs. As to the “Fund damages,” that number does not entail any payment to or for the benefit of claimant; rather, it is an amount agreed to by the parties, pursuant to Public Health Law § 2999-j (14), on which is calculated the amount of attorneys’ fees to be paid by defendant to claimant’s counsel, so as to reflect the benefit obtained for claimant by entry into the *905 Fund. The attorneys’ fees and disbursements total $559,640.12, of which $275,000 is defendant’s pro rata share based on the Fund damages.[1]
An infant’s compromise hearing was conducted in this matter on October 10, 2012, at which testimony was given by Ivy Joyner, the infant claimant’s mother and guardian, as well as a representative from Hudson Valley Bank who discussed the management of the settlement trust, and a structured settlement broker from the Kipnes Crowley Group who discussed the purchase of an annuity and the periodic structured payments.[2] In addition, claimant has submitted various supporting documents, including affidavits from Ms. Joyner and Dr. Douglas Savino, an attorney affirmation, and a report and supplemental report from Dr. Joseph Carfi. On the basis of these filings and the testimony at the hearing, I find that the proffered settlement is in the best interest of the infant claimant, and have signed the proposed ICO. I write this opinion to explain in further detail two aspects of that order: (1) the determination to approve the case’s placement in the MIF; and (2) the approval of certain payments set forth in the ICO.
Background
Claimant Nyrell Joyner-Pack was born in February 2002 in University Hospital of Brooklyn-Downstate Medical Center (aff of Dr. Douglas Savino 1Í 4). In a claim filed March 23, 2009, claimant alleges, by his mother and natural guardian Ivy Joyner, that Downstate committed malpractice “during his admission to that facility between March 13, 2002 and July 17, 2002” (claim 1i 5).
The allegations in the claim are as follows: after Joyner-Pack’s birth, he was treated at the hospital for tracheobronchomalacia (TBM), a condition “in which the airway structures are excessively soft and loose, resulting in narrowing and intermittent disruption of air flow into and out of the lungs” (claim 1Í 7). A tracheostomy was performed on March 2, 2002.
*906 During the period that followed, claimant “experienced periods of apnea and bradycardia,”[3] and then suffered a respiratory infection “on or about” May 29, 2002 (id. 1i 8). An MRI was recommended by a staff member at Downstate, requiring intravenous sedation. According to the claim, there was a “substantial risk that inserting an IV line would agitate the patient, thereby acutely and substantially increasing intrathoracic pressure and leading to airway collapse due to the patient’s severe TBM” (id. 1Í10).
After a worsening of claimant’s condition, the MRI was scheduled for June 6. During sedation, the infant, became agitated, his airway collapsed, and he suffered “severe respiratory distress, causing a cardiopulmonary arrest” (id. 1i 12). This, in turn (the claim alleges), was a “substantial factor” in causing permanent brain injury. Specifically, claimant is now afflicted permanently with “hypoxic ischemic encephalopathy, seizure disorder and spastic quadriplegia” (id. 1117). As a result of these injuries, claimant is incontinent, cannot stand or sit without support, is unable to turn over, and does not engage in spoken communication (report & supp report of Dr. Joseph Carfi).
Discussion
I. The Medical Indemnity Fund
The parties’ proposed settlement is premised on the placement of claimant into the MIF. That fund was created in the enactment of the 2011-2012 New York State Budget, as part H of chapter 59 of the Laws of 2011, now codified as title 4 of Public Health Law article 29-D. Put generally, the MIF is supported by a state appropriation, and pays the “qualifying health care costs” of “qualified plaintiffs.” A qualified plaintiff is defined to mean:
“every plaintiff or claimant who (i) has been found by a jury or court to have sustained a birth-related neurological injury as the result of medical malpractice, or (ii) has sustained a birth-related neurological injury as the result of alleged medical malpractice, and has settled his or her lawsuit or claim therefor” (Public Health Law § 2999-h [4]).
A “birth-related neurological injury” is, in turn, defined as follows:
“an injury to the brain or spinal cord of a live infant *907 caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation or by other medical services provided or not provided during delivery admission that rendered the infant with a permanent and substantial motor impairment or with a developmental disability as that term is defined by section 1.03 of the mental hygiene law, or both. This definition shall apply to live births only.” (Public Health Law § 2999-h [1].)
“Qualifying health care costs” are defined as:
“the future medical, hospital, surgical, nursing, dental, rehabilitation, custodial, durable medical equipment, home modifications, assistive technology, vehicle modifications, prescription and nonprescription medications, and other health care costs actually incurred for services rendered to and supplies utilized by qualified plaintiffs, which are necessary to meet their health care needs as determined by their treating physicians, physician assistants, or nurse practitioners and as otherwise defined by the commissioner in regulation” (Public Health Law § 2999-h [3]).
The Fund is administered by the Superintendent of the Department of Financial Services (DFS) (Public Health Law § 2999-i [2] [a]). Its purpose, as stated in the statute, is to “provide a funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage” (Public Health Law § 2999-g). Specifically, prior to the enactment of title 4, settlement agreements addressed health costs for neurologically impaired infants via lump-sum payments or the creation of a supplemental needs trust (see Mendez v New York & Presbyt. Hosp., 34 Misc 3d 735 [Sup Ct, Bronx County 2011]). When a claim is placed in the Fund, however, the infant’s qualifying health expenses are paid from the Fund as they are incurred (id. at 739; Public Health Law § 2999-j).
When a settlement agreement “aris[es] out of a . . . birth related neurological injury,” the settlement must provide that “in the event the administrator of the fund determines that the . . . claimant is a qualified plaintiff, all payments for future medical expenses shall be paid in accordance with this title, in lieu of that portion of the settlement agreement that provides for payment of such expenses” (Public Health Law § 2999-j [6] *908 [a]). When such a settlement does not so provide, the court shall direct its modification to include this language (id.). The statute applies to all “birth-related neurological injury lawsuits as to which no judgment ha[d] been entered and no settlement agreement ha[d] been entered into by the parties before the date of enactment” (L 2011, ch 59, part H, § 111 [q]). As noted above, a qualified plaintiffs attorney’s fee is (subject to Judiciary Law § 474-a) deducted from the claimant’s award for “non-Fund” damages (i.e., pain and suffering), and paid by the defendant as to the “Fund” damages, i.e., the amount of the settlement agreed upon so that the value of the Fund to claimant may be in some manner reflected in the attorney’s fee (Public Health Law § 2999-j [14]).
This matter was transferred to me by order of the presiding judge filed April 4, 2012. By letter dated April 16, 2012, the court raised sua sponte the question of whether claimant was a “qualified plaintiff’ under title 4, i.e., whether the case at issue appropriately fell within the Fund in the first instance, and directed the parties to make submissions on this question. Claimant’s counsel argued in response that the case fell within the relevant statutory definition, for reasons discussed below. Defendant, for its part, declined to take a position on claimant’s submission, but rather indicated by letter that it “[did] not oppose the claimant’s application for an Infant’s Compromise Order according to the terms that were negotiated.” The issue received further consideration at a hearing before the court on May 15, 2012.
The claim does not allege that the TBM was the result of malpractice, that any malpractice was performed in the birth or delivery of the infant, or that any malpractice was committed in the conduct of the tracheostomy. Further, while the claim alleges that the malpractice commenced on March 13, 2002, there is no specific misconduct alleged against the Downstate staff prior to the scheduling of the MRI on June 6, which the claim asserts was “a departure from good and accepted practice” not to have been deferred under the circumstances (claim H 12). Claimant also alleges that the staff departed from good and accepted practice on June 6, in its “effort to manage the cardiopulmonary arrest” (id. 1113).
Claimant’s counsel argues that the injury is “birth-related” because Joyner-Pack suffered “an injury to the brain or spinal cord . . . caused by the deprivation of oxygen ... by other medical services provided or not provided during delivery admission” (letter to ct of May 4, 2012). At the May 15, 2012 hearing, *909 counsel contended that although the injury took place during a surgery four months after birth, it nevertheless was part of the infant’s “delivery admission,” since Joyner-Pack had never left the hospital from the time of his birth to the date of the alleged malpractice. When asked whether this would render any infant “qualified” for any covered malpractice no matter how remote in time from the birth, so long as the child had been continuously hospitalized, counsel suggested that a “rule of reason” should apply.
Before I address this specific argument, I note a preliminary issue: the statute may be read either to give authority to the court, or to the Fund administrator, to determine whether a particular claimant is “qualified.” On the one hand, section 2999-j (6) (a), cited above, implicitly requires the court in some instances to determine whether a settlement agreement “aris[es] out of’ a birth related neurological injury, as that is the statutory predicate to the court requiring in the settlement a provision that health care costs be paid out of the MIF. On the other hand, this provision still subjects admission into the Fund to a determination by the administrator that the claimant is qualified (see Public Health Law § 2999-j [6] [a]), and the statute further provides that post-settlement enrollment into the Fund occurs only when the “fund administrator determines upon the basis of such judgment or settlement agreement and any additional information the fund administrator shall request that . . . the plaintiff is a qualified plaintiff’ (Public Health Law § 2999-j [7] [b] [emphasis added]).
The regulations promulgated on the MIF by the New York State Department of Health (DOH), however, anticipate that the court will determine whether settled cases meet the statutory criteria for inclusion in the Fund.[4] Those regulations state that all that is required for enrollment in the Fund is a release form, application and “certified copy of a judgment or court-ordered settlement that finds or deems the plaintiff to have sustained a birth-related neurological injury” (New York State Department of Health, Emergency Regulation: NYS Medical Indemnity Fund, Summary of Express Terms at l).[5] Further, *910 the DFS application for entry into the Fund specifically requires submission of a “judgment or court-approved settlement that found or deemed the Qualified Plaintiff to have sustained a birth-related neurological injury on or after April 1, 2011.” (New York State Department of Financial Services, New York State Medical Indemnity Fund Application at 2, available at http://www.dfs.ny.gov/insurance/mif/mif_application.pdf.) Thus, the regulations and administrative procedure presume that the court will make a finding on this issue, and essentially defer to such finding in determining which cases shall be placed in the Fund.
In light of the foregoing, a court must exercise care in determining whether a claimant is “qualified” for the Fund. The parties to a malpractice action involving an infant will generally have a significant incentive to place the case into the Fund, so long as there is any argument that it meets the statutory terms. That is because, in the event a claimant is deemed “qualified,” the expenses of claimant’s “qualifying medical costs” will be paid out of the Fund and not by defendant, lowering defendant’s costs (and thereby freeing up settlement funds for direct compensation to claimant), without diminishing claimant’s future care. The Fund is, under the current statutory scheme, funded via state appropriation (see Public Health Law § 2999-i [5]).
But if a claim is inappropriately placed in the MIF, the parties to the settlement will impose costs on the State of New York beyond those authorized by the governing legislation. Moreover, in the event the liabilities of the Fund exceed 80% of its assets for the coming year as determined by an annual actuarial calculation, the MIF is closed to new entrants (Public Health Law § 2999-i [6] [a]). In short, where the settling parties agree that a claim falls within the Fund, court review may be the only check against their drawing on Fund resources in circumstances not within the statute’s contemplation, thereby imposing costs on the State fisc and potentially depriving future parties who fall within the law’s intended ambit of benefits thereunder.
At the same time, however, the court is charged with the duty to determine whether the terms of an infant’s compromise order are in the best interests of the infant claimant (see Gold v United Health Servs. Hosps., 95 NY2d 683, 691-692 [2001]; see also Valdimer v Mount Vernon Hebrew Camps, 9 NY2d 21, 24 [1961] [“courts are bound to protect infants, who are their wards”]). This can be in tension with the court’s role in *911 determining that a particular claim falls within title 4, since holding that a claim falls within the Fund will often advantage claimant by ensuring access to medical care and augmenting the funds available for settlement.
This difficult balance is tipped in the present case by one crucial factor: the State of New York, which funds the MIF, is a party to this action. Moreover, the State is represented by the Office of the Attorney General, the entity vested with “charge and control of all the legal business of the departments and bureaus of the state ... in order to protect the interest of the state” (Executive Law § 63 [1]). Needless to say, among those departments is DFS, the Fund administrator. The State thus has the means in this instance to ensure that its interest in proper construction of title 4 is protected, and it has stated that it has no objection to payment of claimant’s expenses via the Fund.
At the infant’s compromise hearing, the Attorney General took the position that it did not have the ability to decide for the Fund’s administrator which cases fall within the MIF. But, as noted, under the DOH regulations it is the court and not the administrator that is made the gatekeeper for the Fund, and thereby charged with making a finding as to whether the claim is appropriate for placement in the MIF. The State, as a party, has the ability and interest to raise any concerns it has about application of title 4 with the court during the settlement process, and thus create a proper record on which the court may resolve this issue. When it does not do so, its position is tantamount to a waiver of any such argument for purposes of the action at issue, at least so long as the argument that claimant is “qualified” is colorable.
In the present case, I cannot find that the position taken by the parties is without an arguable legal basis. The term “delivery admission” is not defined by statute; the DOH regulations define it, however, as a “hospital admission for the specific purpose of giving birth” (10 NYCRR 69-10.1 [h]). The question raised by the regulatory definition for the current case is this: once the “specific purpose of giving birth” is complete, does the admission continue so long as the child remains in the hospital, even on matters unrelated to the birthing process, or does the continuation of the infant’s hospital stay thereafter constitute a new “admission”? The statutory language, cited above, is susceptible to both constructions. There is some indication in the legislative history that the intent of the law was to specifi *912 cally address injuries involving obstetrical treatment — i.e., during childbirth or in its immediate aftermath,[6] and that conclusion receives support from the plain language of the statute that specifically references “birth-related” injuries. Nonetheless, where the party that will be footing the bill for the Fund does not object to claimant’s placement therein, deference to the construction upon which the settlement is premised is appropriate. Further, as the present claimant is an infant that suffered neurological impairment at the beginning of his life from oxygen deprivation, such placement is consistent with the Fund’s general purpose.
In light of the foregoing, I find solely for purposes of the present action that the infant claimant suffered his impairment during a “hospital admission,” and his claim therefore “aris[es] out of a . . . birth related neurological injury.” (Public Health Law § 2999-j [6] [a].) The case, therefore, properly belongs in the MIF.
II. Payments Authorized by the ICQ
A second concern raised by the proposed ICO is that it provides for a number of payments to be made to Joyner-Pack’s *913 parent and guardian, and for use of settlement funds to pay for necessities that generally have been regarded by the case law as parental responsibilities. For example, the ICO permits payment to Ivy Joyner, or any legally appointed guardian of Nyrell Joyner-Pack of up to $2,000 per month for the infant’s care and maintenance, and $1,000 per month (adjusted 3% per annum) for services rendered by Joyner in caring for claimant;[7] $500 quarterly to pay for claimant’s clothing and shoes; and $72,000 for an automobile and the cost of car insurance.
As a general matter, infant settlement funds belong to the child alone (see DeMarco v Seaman, 157 Misc 390, 395 [Sup Ct, Queens County 1934] [“(t)he infant’s money (is) awarded to compensate him for his pain, his suffering and his incapacity” (emphasis omitted)]; Matter of Stackpole v Scott, 9 Misc 2d 922, 925 [Mun Ct, Queens County 1957] [“(w)e must ever remind ourselves that the money on deposit is the infant’s property and the court has full control of the money allotted to the infant which is held subject to the order of the court until the infant attains his majority when it should be delivered to him”]). Upon reaching majority, the child “has a right to expect to receive the money awarded him for his injury with interest” (Caban v Lonkey, 53 Misc 2d 171, 172 [Civ Ct, NY County 1967] [citation omitted]). In light of these principles, courts have refused to allow parents to withdraw money from their infant’s settlement funds to pay for the necessities of life for which parents are responsible, absent specific proof of financial distress (e.g. Marsh v La Marco, 46 AD2d 888, 889 [2d Dept 1974] [when infant settlement has been made “courts have been properly disinclined to permit the moneys so derived to be used by the infant for his own or his family’s necessaries”]; Pena v Bronx-Lebanon Hosp. Ctr., NYLJ, Apr. 21, 2008 at 27, col 3 [Sup Ct, Bronx County 2008] [“It is the primary duty of the parent to support a child (and) said duty should not be shifted to the infant” (citation omitted)]; Matter of Smith v Lavine, 78 Misc 2d 776, 778 [Sup Ct, Monroe County 1973] [infant settlement money is “not to purchase necessaries for him during his minority”]). Thus, for example, courts have found the withdrawal of infant settle *914 ment funds to purchase clothing to be an inappropriate use of settlement proceeds (see Smith, 78 Misc 2d at 779).
The relevant regulations also specifically forbid withdrawal of settlement funds “except for unusual circumstances, where the parents are financially able to support the infant and to provide for the infant’s necessaries, treatment and education” (22 NYCRR 202.67 [g]).[8] A showing of financial inability must be based on detailed information demonstrating that each particular expense is not within the parent’s means (see Matter of Pineda, 168 Misc 2d 845, 848-850 [Sup Ct, NY County 1996]; Gaffney v Constantine, 87 NYS2d 131 [Sup Ct, Queens County 1949]).
Although Ivy Joyner’s testimony at the hearing showed financial hardship on her part, it did not establish with the specificity required by the above case law that she was financially unable to support her child absent every one of the withdrawals permitted by the settlement agreement. Nonetheless, this case presents “unusual circumstances” which warrant departure from the standard principles cited above, as a rigid application of those principles would not serve the best interests of the infant claimant, and would elevate form over substance.
Claimant Nyrell Joyner-Pack is, and so far as the medical reports before me indicate will forever remain, entirely dependent on his family or on institutional caregivers for every aspect of his life. He cannot use language, nor move about on his own, nor feed himself, nor live in a manner that is in any way independent of those around him. He is, the medical submissions attest, at the developmental level of a four-month-old child. Moreover, his “qualifying medical costs” will be provided for via the MIE Under these circumstances, I find that use of the settlement proceeds to provide for the necessities of Joyner-Pack’s life (and to do so in as comfortable a manner as possible), and to aid his family in caring for him in his home, is in claimant’s best interests. To preclude the use of settlement assets for these purposes, in order that they will be available to claimant when he reaches the age of majority or some other, undisclosed purpose is to draw a wholly artificial boundary. When claimant turns 18, the evidence before me indicates he will remain in the same developmental state as he is at present, and the potential *915 uses for the settlement assets will be subject to the same practical limitations.
Under these circumstances, and given the extraordinary responsibility claimant’s mother faces in providing him with care, some greater leeway is warranted so that his parent and guardian may make use of the settlement fund to provide for her son, and to mitigate the great difficulties presented by claimant’s state.
For these reasons, and on the basis of claimant’s submissions and the testimony given at the infant compromise hearing, I find that the ICO is in the best interests of the infant claimant, and I approve the settlement agreed to by the parties in this case.

. The remainder of the fee is comprised of $273,928.88 attributed to the past pain and suffering damages, and $10,711.24 in disbursements.

. Nyrell Joyner-Pack’s presence was waived by the court on the basis of a doctor’s affirmation, which indicated that such attendance would “pose a risk to his health” (Savino aff H 11; see also CPLR 1208 [d] [attendance of infant at compromise hearing may be waived for “good cause”]).

. The claim does not state whether these symptoms were related to the TBM.

. The court clearly has the authority to make such determination where a case has been tried to verdict (see Public Health Law § 2999-j [6] [b] [“Upon a finding by the court that the applicant has made a prima facie showing that the plaintiff is a qualified plaintiff, the court shall ensure that the judgment so provides”]).

. Available at http://www.health.ny.gov/regulations/emergency/docs/201212-06_medical_indemnity_fund.pdf.

. Such language can be found, in particular, in statements by health care providers’ organizations that initially proposed such a fund (e.g. Hon. Douglas E. McKeon, Symposium, On the Table: An Examination of Medical Malpractice Litigation, and Methods of Reform: New York’s Innovative Approach to Medical Malpractice, 46 New Eng L Rev 475, 483 [spring 2012] [citing Dec. 2009 testimony before the New York State Senate in support of Fund that the “single biggest driver” of malpractice costs, which witness defined as “obstetrics — the delivery of babies”]; Healthcare Association of New York State, Recommendations of HANYS’ Task Force on Improving New York State’s Medicaid Program at 44 [Nov. 2010], available at http://www.hanys.org/ finance/legislation/medicaid/task_force/docs/2010-ll_recommendations_of _hanys_task_force_on_improving_new_york_states_medicaid_program.pdf [stating, in proposing such a fund, that cases involving “neurologieallyimpaired infants . . . almost always involve obstetricians”]; Greater New York Hospital Association, Oveiniew of the New York State Medical Indemnity Fund for Neurologically Impaired Newborns at 2 [Mar. 2011], available at http:// www.gnyha.org/10711/File.aspx [characterizing legislation that enacted MIF as covering “newborns” who have “sustained neurological injury”]). Those statements have some bearing on this issue, as provider trade associations proposed the Fund as members of the Medicaid Redesign Team (MRT) (see Executive Order [Cuomo, A.] No. 5 [9 NYCRR 8.5]), which ultimately led to its enactment in the fiscal year 2011 budget. The MRT’s own documents, however, shed little light on this question, stating only that the Fund covers ‘ ‘[n]eurologically [i]mpaired [i]nfants” (e.g. Redesigning the Medicaid Program, Medicaid Redesign Team Meeting at 51 [Feb. 9, 2011], http:// www.health.ny.gov/health_care/medicaid/redesign/docs/2011-02-09_redesign _team_presentation.pdf).

. Both the $2,000 and $1,000 monthly payments will cease if Joyner-Pack is institutionalized, and under certain other specified circumstances. The ICO proposed by the parties also allows the $2,000 monthly to be spent on “incidental expenses.” That term is insufficiently defined to ensure that the money is used for claimant’s benefit, and so has been removed from the signed order.

. While the regulation and case law cited above concern post-settlement applications for withdrawals, there is no reason why the same standards should not apply where the withdrawal is to be permitted going forward in the settlement agreement itself.