OPINION OF THE COURT
Robert D. Lippmann, J.
This is a petition brought under article 81 of the Mental Hygiene Law for the appointment of a guardian of the person and the property of Adonis Pineda, an infant. Included in the petition is an application for withdrawals from Adonis’ personal injury fund for payment of extraordinary expenses as well as his necessities. Article 81 is an adult guardianship law. Its provisions contemplate the incapacitated person to be self-supporting. The question presented by the instant application, therefore, is whether an infant incapacitated person should likewise be expected to be self-supporting.
Adonis Pineda was born November 27, 1988. Before his first birthday, on October 12,1989, he was struck by a vehicle which nearly severed his leg and left him mentally retarded, probably for life. Now seven years old and physically robust, he speaks but a few words, lacks judgment commensurate with his age, is constantly in motion but so totally lacking in an awareness of danger that he must be constantly supervised. As a result of the same accident, his mother, Allison Marmol, petitioner herein, was also injured. Her knees were crushed and she suffers from short-term memory loss.
An action on behalf of Adonis was settled for $5,400,000. Of this sum he has received $700,000 and will continue to receive $98,218.75 semiannually until September 1, 2023, when he will receive a lump sum of $3,143,000. There is presently $627,657.56 in his account.
Allison Marmol’s action was settled for $1,500,000. To date she has received $477,000 and will continue to be paid $17,137.50 semiannually for 23 years when a lump sum of $457,000 will be turned over to her. She has presently in her account $331,000.
Adonis’ father, Fausto Pineda, was incarcerated in a Federal correctional facility shortly after his son’s birth and while he has since been released, he earns too little from part-time employment to contribute to his son’s support. Moreover, since the Immigration and Naturalization Service has commenced deportation proceedings against him, he is not a viable source of support.
*847 Ms. Marmol is now married to Mario Pena, who, as Adonis’ stepfather, has no legal obligation to support him. Upon settlement of her case, Ms. Marmol went off the public assistance roll and now supports her family, which includes not only Adonis but also her two other children by Mario Pena. She anticipates substantial medical expenses for treatment of various conditions stemming from injuries incurred in the 1989 accident. Petitioner and her husband wish to relocate their family, including Adonis, to Santo Domingo, Dominican Republic, where Ms. Marmol’s mother resides. Mario Pena is presently there seeking employment, but, according to Ms. Marmol, he has worked only at low-paying menial jobs.
Ms. Marilyn White, a highly experienced rehabilitation specialist, with court approval, accompanied Ms. Marmol and Adonis to Santo Domingo in November 1995 to determine the availability and assess the quality and cost of various care providers. She has recommended a life care plan for Adonis, submitted with the petition, which describes the prospective treatments and therapies, the condition they aim to ameliorate, the frequency of the treatments and hours involved, the names and addresses of most of the providers (others are still to be found) and the fees demanded in estimated or exact dollar amounts. Specifically recommended are bilingual special education, physical and occupational therapy, behavioral modification therapy, treatment for attention deficit disorder, speech and language therapy, family behavioral modification, especially between Ms. Marmol and Adonis, neurological and orthopedic care, a home attendant for several hours a day, semiannual replacement of Adonis’ leg brace to accommodate his growth, the services of a rehabilitation case manager to coordinate these various programs and monitor Adonis’ progress. Also recommended are the services of an accountant, and as may be necessary, those of legal counsel.
Petitioner’s application for withdrawals covers the cost of all of the above. She also seeks to use the infant’s funds for routine pediatric and dental care and for the purchase of an automobile, to be replaced every eight years, plus the cost of maintenance and mileage. In addition it is also requested that $125,000 of Adonis’ money be used towards the purchase of a ranch-style house with amenities to accommodate his disability.
By its July 27, 1995 order granting interim relief after a hearing, this court appointed Allison Marmol guardian of the person and Rebecca Rawson, Esq. temporary coguardian of the *848 property of Adonis Pineda, with authority under article 81 to withdraw from Adonis’ funds "expenses reasonably necessary to maintain the IP” (incapacitated person).
The purpose of article 81 of the Mental Hygiene Law, which became effective April 1, 1993, was to create a guardianship law to meet the needs of elderly persons afflicted with the various, too-bountiful ills that flesh is heir to. As expected, the vast majority of cases reported to date involve the aged, but nothing in the statute precludes its use for the young. A guardian may be appointed for anyone, of whatever age, who is functionally disabled to make a decision affecting his or her life. The provisions of article 81 authorize the guardian to use the assets of the incapacitated person for the maintenance of that person. {See, Mental Hygiene Law §§ 81.02, 81.21 [a]; §§ 81.16, 81.20 [a] [6] [iv].) Tailored to the needs of the incapacitated adult, the statute does not address the unfortunate circumstance where, as here, the incapacitated person is an infant, and it is therefore silent with respect to the obligations and responsibilities of the parents to the incapacitated child.
The instant petition presents a rare instance of the relatively new statute being applied to a minor and is the first to raise the question of the appropriateness of using a child’s assets for his support.
Petitioner could have chosen to seek the relief she requests either under Mental Hygiene Law article 81 or CPLR article 12. Article 12 is generally used to hold the proceeds of an infant’s personal injury settlement until he reaches his majority, the parents being legally obligated until then to pay for the child’s support. (See also, Domestic Relations Law § 32; Family Ct Act § 413.) Only in the rare case where an infant is not expected to reach competence upon attaining his majority are those funds held under article 81 "to insure maximum protection”. (Matter of Ramos, 111 Misc 2d 1078, 1079 [Sup Ct, Bronx County 1981].) As regards an infant, neither the obligations of parental support nor the protective mantle of the court is swept aside or in any way diminished by the election of article 81 as the vehicle for the appointment of a guardian and the application for withdrawals from the infant’s account. The provisions of article 81 and of CPLR article 12 must be brought into logical harmony where an infant becomes the subject of an article 81 proceeding, since the child’s right to parental support is not thereby forfeited, nor as a result is public policy to protect the welfare of children cast aside.
Accordingly, casé law developed under CPLR article 12, under which are brought applications for withdrawals of infant *849 funds, warrants review. The matters that should be considered when such withdrawals are requested are fully set forth in DeMarco v Seaman (157 Misc 390 [Sup Ct, Queens County 1934]); Matter of Stackpole (9 Misc 2d 922 [Mun Ct, Queens County 1957]); Leon v Walker (1 Misc 2d 219 [Sup Ct, NY County 1955]); and Zambrana v Railway Express Agency (11 Misc 2d 553 [Sup Ct, NY County 1956]; see also, Matter of Curry, 128 Misc 2d 760 [Sur Ct, Dutchess County] [brought under SCPA article 17 for a good discussion of CPLR article 12]). The authoritative case in the field is DeMarco v Seaman (supra), cited by nearly all subsequent cases dealing with the issue. In that case as well as in Gaffney v Constantine (87 NYS2d 131 [Sup Ct, Queens County 1949]), Justice Cuff dramatized with the skill of a playwright the plight of an injured child in the care of his impoverished parents who are seeking the court’s permission to withdraw funds from the infant’s account. In the process, Justice Cuff set forth the underlying principles which courts have since applied when faced with like situations: It is the duty of the court to protect the child’s fund until he reaches his majority; it is the duty of the parent to support the child until that event; it is the duty of the petitioner to submit detailed information which would justify the court’s authorization to deplete the infant’s funds for extraordinary expenses beneficial to the child and not affordable to the parents, and such approved expenditures should be disbursed directly to the creditor.
The detailed information required to be joined with the petition for withdrawal of the infant’s fund, as outlined in DeMarco (supra) was emphasized and enumerated in Matter of Stackpole (supra) and codified in Uniform Rules for Trial Courts (22 NYCRR) § 202.67. Among the items to be included in the application under section 202.67 (f) are
"(1) a full explanation of the purpose of the withdrawal;
"(2) a sworn statement of the reasonable cost of the proposed expenditure * * *
"(4) the date and amounts of the infant’s and parents’ recovery;
"(5) the balance from such recovery * * *
"(7) a statement that the family of the infant is financially unable to afford the proposed expenditures.”
Subdivision (g) of section 202.67 provides "No authorization will be granted to withdraw such funds, except for unusual circumstances, where the parents are financially able to support *850 the infant and. to provide for the infant’s necessaries, treatment and education.” Two separate standards for approval of withdrawal of funds are imposed under section 202.67 (g): withdrawals for "unusual circumstances” — those necessitated by the child’s disability — need not be predicated upon the parents’ inability to pay for them; those for "necessaries, treatment and education” must be supported by clear proof that the parents are too poor to provide them. An application for either expenditure must comply with section 202.67 (f), but if the withdrawal is for the infant’s necessities, it is critical that there be compliance with section 202.67 (f) (7) and that sufficient facts be submitted to enable the court to determine, without conjecturing, that support of the child is not within the financial means of the parents. This is a departure from the DeMarco v Seaman rule, which held that the child’s personal injury recovery was so inviolable that only extraordinary expenses justified withdrawals and that social agencies were to provide for a child’s support where parents financially could not. (See, Matter of Smith v Lavine, 78 Misc 2d 776 [Sup Ct, Monroe County 1973] [wherein the court denied reimbursement to Social Services from the child’s personal injury settlement].) Section 202.67 (g) now permits withdrawals from the infant’s funds for his support, but only upon clear proof that such is justified by the financial circumstances of the family.
Accordingly, in reviewing the withdrawals requested by petitioner, it must first be determined whether the proposed expenditures are necessitated by extraordinary circumstances or are for necessities of everyday life. Treatment for disabilities which are occasioned by the accident and would not be required by a healthy, normal child are clearly "unusual circumstances” and constitute extraordinary expenses. In this category fall all the costs associated with the various therapies, special education, neurological and orthopedic treatment, the replacement of the leg brace, as well as the concomitant expenses of a rehabilitation case manager. The amount settled on Adonis was precisely to compensate him for his injuries and to ameliorate his handicaps as far as possible. Use of his funds for these treatments and services are, therefore, appropriate. On the proof submitted it is sufficiently clear that Adonis’ family does not have the resources to cover these costly extraordinary expenses. These withdrawals from his funds are therefore approved. The services of an accountant are also approved as are the services of legal counsel if such are needed. It has been amply substantiated that Adonis, being in perpetual motion *851 and unaware of peril, must be constantly supervised to safeguard him against danger. Ms. Marmol has two other small children to tend to and it is obvious she cannot keep a watchful eye on Adonis at all times. Accordingly, the cost of a home aide is likewise approved. However, all bills, which are to be detailed (nature of treatment, hours, days per week), are to be sent to the guardian of the property who will pay same, after verification, directly to the creditors.
Petitioner also requests withdrawals of $25,000 every eight years for the purchase of an automobile (which is more expensive in the Dominican Republic than in the United States) and an additional $167 a month for maintenance and mileage. The family is determined to live in Santo Domingo where public transportation is not extensively developed and private means of transportation must be relied upon. Given the importance of therapy to Adonis’ development and well-being, and the frequency with which he must attend therapeutic sessions of various kinds, and in view of the fact that these would not be necessitated but for his injuries, the court is of the view that the expenditure should be deemed extraordinary. That the family would also benefit from the use of a car is not sufficient reason to disqualify the expense as extraordinary. This application is, therefore, granted to the extent of permitting the funds required for the purchase of an automobile. The cost of maintenance, mileage and insurance is to be borne by the family as a quid pro quo for the benefit and convenience it will derive from such means of transportation. Applications for future replacements should be directed to this court; circumstances change; Adonis’ needs eight years hence are presently unknown.
As for the application for withdrawals to cover the cost of routine dental and pediatric care, these items fall within the category of necessities, which parents must provide for their children. Such normal medical attention is not occasioned by the accident. To justify judicial authorization for payment of routine pediatric and dental care, petitioner must convince the court by clear proof that the family cannot financially undertake the expense. These are not burdensome expenses and the proof preferred does not warrant alleviating Ms. Marmol from her parental obligation.
Finally permission is requested to use $125,000 of Adonis’ money towards the purchase of a family home. Since housing is one of the most basic of necessities, the proposed purchase to be financed in part with Adonis’ funds is vigorously opposed by *852 the temporary guardian of the property, who correctly points out that while petitioner has sufficiently substantiated she cannot afford Adonis’ extraordinary expenses, she has not submitted the clear proof required with regard to the household income or the household budget, nor is there information regarding Mario Pena’s income other than the claim that he earns little from menial work. While it is true that Mr. Pena has no legal obligation to support Adonis, he does have a legal obligation to support ,his own two children. His contribution to the household budget is not at all indicated. To use Adonis’ funds to house the family is to impose upon the child the obligation of support of his parents and siblings. But the infant’s funds "are not community property for family use”. (Caban v Lonkey, 53 Misc 2d 171, 172 [Civ Ct, NY County 1967].)
Petitioner argues, and Ms. Marilyn White corroborates, that Adonis’ orthopedic condition combined with his inability to appreciate danger makes a ranch-style house with four bedrooms (for the parents and for each child) highly desirable and even necessary. After researching the housing market in Santo Domingo and comparing the cost of renting an apartment with the cost of purchasing a house, Ms. White concluded that it is economically sounder to buy than to rent. To date no house has been located but Ms. White estimates the price as ranging between $250,000 to $400,000.
The issue of the appropriateness of using an infant’s funds for the purchase of a family home has been addressed in several cases. In Conigliaro v Rosa (24 Misc 2d 15, 16 [Sup Ct, Nassau County I960]) the court denied the petitioning father’s application for withdrawals to make payment upon two mortgages on a home occupied by the infant, his parents and siblings because, as it stated, "The parents have a primary duty to support which should not be shifted to the infant”. In Matter of Redden (NYLJ, Mar. 6, 1992, at 24, col 3 [Sur Ct, Bronx County]) the court permitted the child’s funds to be used towards the purchase of a cooperative apartment where petitioner had taken measures to fully reimburse the child’s account within 18 months. In re Christopher W. (NYLJ, Mar. 26, 1991, at 25, col 3 [Sur Ct, Bronx County]) concerned an incompetent 19 year old who occupied cramped quarters with his large family. The court, after ascertaining that the withdrawal would leave sufficient income to pay for the ward’s projected future expenses, authorized an expenditure representing a 25% interest in the premises and ordered that marketable title be taken in the name of the ward as a tenant in *853 common and that his interest be in all respects protected. The court further ordered the guardian ad litem to attend the closing.
In Matter of Sola (NYLJ, Oct. 3, 1990, at 24, col 4 [Sur Ct, Bronx County]) the court permitted the petitioning mother to obtain a $30,000 mortgage on premises held in part by the infant to prevent her creditors from foreclosing on her interest in the premises with the attendant risk of losing her home and that of the child. However the application was approved on condition petitioner conveyed to the infant one half of her own interest and agreed to give up all but one of her credit cards. The case illustrates the court’s concern to erect protective hedges around the child’s funds. It is also a cautionary tale of the risks inherent in a child’s partial ownership in property also held by an insolvent parent.
In Matter of Genco (NYLJ, Feb. 8, 1984, at 15, cpl 5 [Sur Ct, Nassau County]) parents proposed to purchase with their disabled child’s funds a home subject to a mortgage, with space and facilities needed to meet his physical limitations. Noting that the parents, both of whom were employed, would be financially depleted by such a purchase, the court approved the withdrawal, subject however to title vesting in the infant. The court viewed the purchase of a house as "an appropriate alternate form of investment for Christopher as well as an expenditure reasonably necessary for his support.” However, that part of the petition which sought the infant’s funds to defray the cost of utilities, mortgage payments and other carrying charges were denied.
Similarly in Matter of Wylie (NYLJ, Sept. 9, 1995, at 33, col 1 [Sur Ct, Suffolk County]) expenditure of the infant’s fund towards the purchase of a house beneficial to his development was treated as a business investment which the court permitted on condition the mortgage be filed and recorded for the benefit of the infant at the rate of 51/z% per annum.
Exhibiting a like concern for the investment worthiness of a transaction involving a child’s funds, the court in Islam v Capone (NYLJ, Feb. 10, 1995, at 37, col 6 [Sup Ct, Queens County]) viewed as too speculative the proposed purchase of a multiple dwelling, one of whose four apartments, with no unusual facilities to satisfy the infant’s physical needs, was to be occupied by the family.
Extracting the guidelines from the above cases it may be concluded that the use of infants’ funds for the purchase of a family home will be judicially authorized provided: (1) by clear *854 proof the parents show they cannot afford the purchase price or a portion thereof; (2) the house has features beneficial to the child and accommodates his physical limitations; (3) the purchase price is fair; (4) title is vested in the child at least to the proportionate degree of his investment in the house; (5) necessary measures are taken, where needed, to safeguard the investment against the profligacy of the parent; (6) parents offer a quid pro quo; and (7) the funds remaining after the outlay are sufficient to meet the future needs of the infant and where the child is expected to remain incompetent, for the anticipated duration of his life.
With the above provisions in mind, the court now turns to the application at hand. Ms. Marmol presently has in her account $331,000 and will continue to receive payments of $34,275 annually for the next 23 years. The lump sum of $457,000 she will then receive is too remote in time to be a factor at present in assessing the family income. She anticipates incurring substantial medical expenses for her own rehabilitation. Mr. Pena’s contribution remains unknown but is apparently small and Mr. Pineda does not contribute at all to Adonis’ support, Ms. Marmol claims.
From this financial picture of the family, it is clear petitioner could not undertake the full cost of the purchase price of the house she envisions since it would greatly deplete her assets and reduce them below the point at which she could support her family. She does, of course, have the means to contribute to the purchase. The court is of the view, however, that in the long term it may be more prudent to have Adonis fully finance the purchase of the house, with title vested entirely in his name, thus securing his investment against liens and attachments as well as protecting it against mortgages or use as collateral against loans made by any family member now or in the future. As in Matter of Genco (supra) such use of Adonis’ money would represent an appropriate alternative form of investment for him and he would thereby be shielded against the pitfall that gave rise to Matter of Sola (supra).
Of course, the court cannot authorize withdrawals for a house that has not been identified. Such a house must not only be suitable to meet Adonis’ physical and mental limitations but represent a sound, fairly priced real estate investment without expensive indulgences. When located, the service of an independent appraiser should be sought to assess its fair market value.
Since Adonis is unlikely ever to be competent, he will never be in a position to personally ask the court to make an ac *855 counting of his money. All the more reason for this court to scrupulously discharge its duty to him. It therefore behooves this court to ensure that funds are available for his support and medical needs during the full span of his life expectancy. The future is always uncertain; medical conditions may be exacerbated, recessions may devaluate investments, and inflation increase the cost of necessities. Yet, given the amount of the settlement, it is as reasonably certain as one could wish that Adonis’ future is financially and securely provided for and that this one-time depletion of his funds, though substantial, will in no way endanger that prospect. Given that the investment represents but a transformation of assets which can be liquidated if needed, the withdrawal should add to his future security rather than threaten it. To safeguard the investment, the cost of title and homeowner’s insurance is to be paid out of his funds. All other expenses associated with maintaining the house, including utilities, taxes and assessments, must be borne by petitioner and her husband.
The application for the purchase of a house with Adonis’ funds is therefore denied without prejudice to renew in accordance with the above.
Rebecca Rawson is hereby appointed permanent guardian of the property of Adonis Pineda under Mental Hygiene Law article 81 with the powers of a guardian of the property of an infant in accordance with this decision. The parties are hereby directed to set a date for a conference preceding a final order.
Petitioner’s application is in part granted, in part denied and in part denied without prejudice to renew.