OPINION OF THE COURT
Gary F. Knobel, J.
The applications by Geoffrey and Jordana M., co-guardians of the personal needs and property of their daughter, Sigal M., an infant adjudicated to be an incapacitated person pursuant to Mental Hygiene Law § 81.02 (b), for an order (1) permitting the guardians to reimburse to themselves, in their capacity as parents, the sum of $33,348.64 from the guardianship account for all of the costs associated with a bat mitzvah party for Sigal, and (2) authorizing the expenditure of approximately $65,000 from the guardianship account to cover the vacation cost for the *381 entire family and an aide, are granted only to the extent indicated below.
These applications present issues of first impression which have not been officially reported upon in Mental Hygiene Law article 81 guardianship proceedings, or in special proceedings pursuant to other statutes which seek the withdrawal of funds from bank accounts held in trust for infants.
Mental Hygiene Law article 81 does not distinguish between infants and adults, nor does it set forth the factors that the court must consider in determining whether monies may be withdrawn from an infant or adult guardianship account for extraordinary expenses. The statute, which was tailored by the legislature to meet the needs of a self-supporting incapacitated adult, “establishes] a guardianship system ... to satisfy either personal or property management needs of an incapacitated person . . . which affords the person the greatest amount of independence and self-determination” (see Mental Hygiene Law § 81.01 [emphasis added]; Matter of Pineda, 168 Misc 2d 845, 848 [Sup Ct, NY County 1996]; Matter of Addo, NYLJ, Sept. 30, 1997 at 26, col 4, 2001 NY Misc LEXIS 1349 [Sup Ct, Bronx County 1997]; Torres, Article 81 of the Mental Hygiene Law: Designed to Protect the Elderly, but Prejudicing Children’s Rights, 7 J L & Pol’y 303 [1998]; Solinski, Guardianship Proceedings in New York: Proposals for Article 81 to Address Both the Lack of Funding and Resource Problems, 17 Pace L Rev 445 [spring 1997]). A guardian appointed to manage the property of an “incapacitated person” has a fiduciary responsibility to prudently use that person’s assets for the maintenance of that individual (see Mental Hygiene Law §§ 81.02 [a]; 81.20 [a] [6] [ii], [iv]; 81.21 [a] [15]) and is obligated to “preserve, protect, and account for such property and financial resources faithfully” (Mental Hygiene Law § 81.20 [a] [6] [ii]). However, the statute is silent on the extent of the obligation and responsibility of a parent/guardian to provide monetary support for an incapacitated child in contrast to other statutes and New York common law which require that a parent provide support for a child (see Family Ct Act § 413 [1]; Matter of Mildred A., 21 Misc 3d 1123[A], 2008 NY Slip Op 52162[U] [Sup Ct, Nassau County 2008]; Matter of Charles v Hussain, 15 Misc 3d 1140[A], 2007 NY Slip Op 51066[U] [Sup Ct, Nassau County 2007]; Matter of Pineda at 848, 852). Despite an infant’s lack of special status within Mental Hygiene Law article 81, trial courts have broadly construed the statute since its enactment in April 1993 *382 to include infants within its protective shield (see Matter of Pineda; see also Matter of A.C., 16 Misc 3d 1119[A], 2007 NY Slip Op 51478[U] [Sup Ct, Bronx County 2007]; Matter of Mildred A.).
In contrast, as discussed in greater detail infra, section 202.67 of the Uniform Rules for Trial Courts (22 NYCRR), titled “Infants’ and incapacitated persons’ claims and proceedings,” governs the settlement of infant personal injury actions in accordance with CPLR article 12, and sets forth comprehensive, specific criteria for the expenditure of funds from the bank or trust accounts created from the settlement proceeds (see 22 NYCRR 202.67 [f], [g]). Neither the Uniform Rules nor CPLR article 12 differentiates between an infant who has been adjudicated an “incapacitated person” and a non-incapacitated infant. Instead, as to “incapacitated persons,” subdivision (h) of section 202.67 mandates a blanket general requirement that “[expenditures of the funds of an incapacitated person shall comply with the provisions of the Mental Hygiene Law” (22 NYCRR 202.67 [h]).
Accordingly, in view of these legislative and administrative omissions, resolution of the issues presented in the applications at bar requires the integration of article 81 of the Mental Hygiene Law, article 12 of the Civil Practice Law and Rules, and section 202.67 of the Uniform Rules for Trial Courts, with the guiding fundamental principle that the court, in exercising its discretion in authorizing the withdrawal of funds from an infant guardianship account, “must be sensitive to [its] statutory duty to preserve the infant’s estate until his [or her] majority and to permit withdrawals only to the extent required for necessities and education that cannot otherwise be provided” (Matter of Dior Polo G., 78 AD3d 941, 941 [2d Dept 2010], quoting Ahders v Southampton Hosp., 90 AD2d 508, 508 [2d Dept 1982]; see Matter of Pineda; Matter of Addo).
Sigal’s infant guardianship account was funded by the structured settlement proceeds of approximately $6,900,000 established by an infant compromise order dated May 11, 2006 (Sup Ct, Nassau County, Cozzens, J., index No. 10831/02), as a result of a medical malpractice action commenced and settled on her behalf. As of December 31, 2011, there was $7,641,798.74 in the guardianship account. Counsel for the guardians represented in a letter to the court dated August 14, 2013, that the most recent account statement reflects a balance of $6,246,079 and annuities in the approximate amount of $1,800,000.
*383 In a comprehensive 17-page long-form order dated December 18, 2006, Hon. Joel K. Asarch adjudicated Sigal, who was five years old at the time, to be an incapacitated person as defined by Mental Hygiene Law § 81.02 (b), finding that she “suffers from cerebral palsy, microcephaly, spastic quadripareses and significant developmental delays.” Judge Asarch directed on page 13 of the order that “Court approval shall be obtained . . . for the payment of any extraordinary expenses, except as otherwise expressly provided herein [on pages 9-11 of this order].”[1] One extraordinary expense he decreed on page 10 of his order was to specifically authorize the co-guardians “to expend from the funds of the Incapacitated Person the maximum sum of $20,000.00 per annum as and for vacation allowance for the Incapacitated Person, her immediate family, any necessary supervision/aide(s), which costs shall include airfare, reasonable hotel accommodations, meals and transportation.” Any intention by the guardians to spend more than $20,000 for family trips or vacations in any one calendar year required court approval (see order dated Feb. 18, 2009, Asarch, J.). The extraordinary expenses associated with Sigal’s bat mitzvah were not mentioned or addressed in Judge Asarch’s order of December 18, 2006, or in any of the subsequent orders he issued in this guardianship proceeding,[2] even though the parent guardians observed the laws and traditions of Orthodox Judaism.
A bat mitzvah, a Hebrew term which means “daughter of the commandment,” is a life cycle milestone within the Jewish religion that represents the attainment of religious and legal maturity and responsibility for 12- and 13-year-old girls; the male equivalent for 13-year-old boys is called a bar mitzvah (3 Encyclopaedia Judaica at 164 [2d ed]). Within the last 50 years, the bat mitzvah and the bar mitzvah have evolved into a cultural phenomenon where the ritual celebration usually encompasses prayers and biblical discourse in synagogue, the per *384 formance of charitable/social justice endeavors, and parties of all sizes {id. at 166).[3]
The guardians’ informal affidavit application for the release of funds from the guardianship account to pay for Sigal’s bat mitzvah party,[4] which was approved by the Court Examiner, was not submitted to the court for review until after the party was held on March 17, 2013. The guardians argue in their affidavit that
“the proposed expenditures [approximately $30,000.00 for, e.g., food and beverages for 217 adults and 20 children, music and live entertainment, invitations, photographer, etc.] are for the benefit of Sigal [M.], as the Bat Mitzvah is her rite of passage into adulthood . . . and is so integral a part of her growth and development [within] the . . . Community .... [Special needs children used to be] denied their basic fundamental right to B’nai Mitzvot.”
They also ask the court to consider that “[they] have always served with outstanding prudence in protecting and investing [Sigal’s] growing assets, even during these most challenging economic times,” and that the court should “take notice of the ongoing and substantial role that Sigal’s brothers play in her life.”
Tragically, Justice Asarch suddenly passed away before the guardians submitted their written request. The case was subsequently transferred to the undersigned. After reviewing the application and the documents annexed by the guardians, this court directed the guardians and their counsel, as well as the Court Examiner, to appear for a conference to explain, and to justify, the post-party application. A conference was eventually conducted by the court on July 11, 2013, at which time the guardians and their counsel orally requested on the record an addition to the written application — that the court also authorize the release of approximately $65,000 to cover inter alia the transportation and lodging cost of a vacation to Israel for Sigal, her aide, Sigal’s parents (the guardians herein), and her three *385 siblings during the period of the observance of the Jewish holiday of Succot. The Court Examiner and Sigal, who was at a sleep-away camp, did not appear at the July 11, 2013 conference.
When the guardians were asked by the court at the conference why they did not first formally seek court approval to withdraw monies from the guardianship account prior to the March 17, 2013 bat mitzvah party, the guardians claimed that they have been fiscally responsible since their appointment, and that based upon the indications Judge Asarch gave in off-the-record conversations with them, they believed that Judge Asarch would authorize such an expenditure from Sigal’s guardianship account. Jordana M. spoke about the severity of Sigal’s incapacity, the heartbreaking ordeal she experienced before, during and after Sigal’s birth, and the great efforts she makes to try to improve Sigal’s life; she claimed that although wheelchair-bound Sigal cannot speak or write, she does understand both English and rudimentary Hebrew. When asked why they,had such a large party for Sigal, Jordana M. responded that the wonderful Orthodox Jewish community where they reside has helped to take care of and nurture Sigal. The guardians conceded that they paid, “with help from grandparents,” for the bar mitzvah celebrations of their two oldest boys, the first at a country club and the second in a school. In supplemental documentation to the court, it was revealed through the guardians’ income tax returns that Geoffrey M. is a self-employed businessman earning approximately $300,000 per year in gross personal income.
Judges have historically viewed a child’s personal injury recovery as inviolable, and that infant settlement funds belong solely to the infant since they are compensation for the injuries sustained by the infant (see e.g. Serrant v Mossi, 40 Misc 3d 1224[A], 2013 NY Slip Op 51298[U] [Sup Ct, Bronx County 2013]; DeMarco v Seaman, 157 Misc 390, 395 [Sup Ct, Queens County 1934]). The court’s primary concern was that the infant receive the bulk, if not the entire amount, of the settlement amount plus accrued interest when the child legally became an adult. The guiding principles were first established in DeMarco v Seaman (157 Misc 390 [Sup Ct, Queens County 1934]) and Matter of Stackpole v Scott (9 Misc 2d 922 [Mun Ct, Queens County 1957]):
“It is the duty of the court to protect the child’s fund until [the child] reaches [the age of] majority; it is the duty of the parent to support the child until *386 that event; it is the duty of the petitioner to submit detailed information which would justify the court’s authorization to deplete the infant’s funds for extraordinary expenses beneficial to the child and not affordable to the parents, and such approved expenditures should be disbursed directly to the creditor” (Gilchrist v Brookdale Hosp. Med. Ctr., 28 Misc 3d 1230[A], 2010 NY Slip Op 51558[U], *2 [Sup Ct, Kings County 2010], quoting Matter of Pineda at 849, citing DeMarco v Seaman, 157 Misc 390 [Sup Ct, Queens County 1934]).
Courts are therefore “disinclined to permit the moneys so derived to be used by the infant for his own or his family’s necessaries” (see Marsh v La Marco, 46 AD2d 888, 889 [1974]). Consequently, for extremely good reason, judges seek to figuratively “erect protective hedges around the child’s funds” (Matter of Pineda, 168 Misc 2d 845, 853 [1996]).
Most of these principles have been codified by CPLR 1211 (a) and detailed formally by section 202.67 of the Uniform Rules for Trial Courts, and serve as the legal predicate in most cases to withdraw monies from the accounts of infants, the vast majority of whom have not been deemed by a court to be incapacitated.
CPLR 1211 (a) provides as follows:
“Allowance for infant’s support.
“(a) Petition to supreme court, county court or surrogate’s court; contents. A petition to the supreme court, county court or the surrogate’s court for the application of an infant’s property or a portion thereof to the infant’s support, maintenance or education shall set forth in detail:
“1. the amount and nature of the infant’s property, where it is situated and how invested, his income from such property or any other source and any claim against the infant;
“2. whether or not the infant’s parents are living and, if either of them is living, all circumstances relative to their ability to support the infant, and, if neither of them is living, the names of other persons legally obligated to support the infant and the circumstances relative to their ability to support the infant; and
“3. the terms of any previous order made by any court within or without the state for similar relief *387 and the disposition made of any property pursuant thereto.”
This statute was supplemented in 1986 by section 202.67 of the Uniform Rules for Trial Courts, which also does not distinguish between an infant and an incapacitated infant. Instead, section 202.67 refers only to an “incapacitated person” and the broad requirement that expenditures for that individual comply with the Mental Hygiene Law (see 22 NYCRR 202.67 [h]). However, subdivision (f) specifically requires that a petition for the expenditure of the funds of an infant shall set forth
“(1) a full explanation of the purpose of the withdrawal;
“(2) a sworn statement of the reasonable cost of the proposed expenditure;
“(3) the infant’s age;
“(4) the date and amounts of the infant’s and parents’ recovery;
“(5) the balance from such recovery;
“(6) the nature of the infant’s injuries and present condition;
“(7) a statement that the family of the infant is financially unable to afford the proposed expenditures;
“(8) a statement as to previous orders authorizing such expenditures; and
“(9) any other facts material to the application” (22 NYCRR 202.67 [f]).
Subdivision (g) of section 202.67 reemphasizes the evaluation of the parents’ financial ability to support the infant: “[n]o authorization will be granted to withdraw such funds, except for unusual circumstances, where the parents are financially able to support the infant and to provide for the infant’s necessaries, treatment and education” (22 NYCRR 202.67 [g]). This rule has been interpreted by trial courts to mean that two separate standards for withdrawal have been imposed by this subdivision: “withdrawals for ‘unusual circumstances’ — those necessitated by the child’s disability — need not be predicated upon the parents’ inability to pay for them; those for ‘necessaries, treatment and education’ must be supported by clear proof that the parents are too poor to provide them” (Matter of Pineda at 850; see Matter of Louis, 21 Misc 3d 1126[A], 2008 NY Slip Op 52246[U] [Sup Ct, Kings County 2008]). The appellate courts have yet to interpret section 202.67 (g).
*388 However, the principle of limiting withdrawals from an infant’s funds — to the payment of necessities and education that could not otherwise be provided for by a parent or legal guardian — has been adopted by the Appellate Division in the First and Second Departments as the key factor the trial court must utilize in determining whether to permit the withdrawal from guardianship funds (see Matter of Dior Polo G.; Matter of Dagani, 226 AD2d 197 [1st Dept 1996]; Ahders v Southhampton Hosp.). These appellate cases appear to involve infants who were not formally adjudicated as incapacitated although they were disabled in varying degrees. In Matter of Dagani (226 AD2d 197 [1996]), an infant born with cerebral palsy and spastic quadriplegia received a large medical malpractice settlement award and the Appellate Division, First Department, held (1) that “[applications for reimbursement from an infant’s guardianship account are governed by CPLR 1211 (a),” (2) that “[withdrawals are permitted ‘only to the extent required for necessities and education that cannot otherwise be provided particularly since the needs of the infant will undoubtedly increase in ensuing years’ (Ahders v Southampton Hosp., 90 AD2d 508),” and (3) that “[t]here should be ‘unequivocal proof of the necessity of each expenditure before a court in its discretion permits withdrawal” (Matter of Dagani, 226 AD2d 197, 199 [1st Dept 1996] [citation omitted]; see also Matter of Mildred A., 21 Misc 3d 1123[A], 2008 NY Slip Op 52162[U] [Sup Ct, Nassau County 2008]).
The principles, statutes and rules cited above can be distilled into the following core criteria in determining whether requested reimbursements from an infant guardianship account for extraordinary expenses should be approved in an article 81 guardianship:
1. are the guardianship assets of an incapacitated infant being scrupulously “preserve[d] [and] protected]” (see Mental Hygiene Law § 81.20 [a] [6] [ii]);
2. what is the functional level, and functional limitations, of the incapacitated infant;
3. what is the current amount of funds in the infant guardianship estate;
4. what is the financial ability of the parents of the incapacitated infant to adequately support the infant; and
5. are the proposed or incurred expenditures for necessities, treatment or educational costs.
*389 Applying this methodology[5] to the applications at bar, the court finds that the bat mitzvah party, although culturally and religiously significant, was not a “necessity” which could not otherwise be provided by her parents, who clearly have the financial ability, with a reported income of approximately $300,000 per annum from a sole proprietorship, to support Si-gal and to provide for such an expenditure.
Accordingly, the written application by the guardians for reimbursement from the guardianship account for the costs associated with the bat mitzvah party for Sigal is denied in its entirety.
The oral application by the guardians for the release of funds from the guardianship account to underwrite a vacation to Israel for Sigal, her entire family, and an aide, is granted to the extent that the court hereby allows the guardians to withdraw, for the calendar year 2013, the amount of the costs of the handicap suite required for Sigal at the Inbal Hotel ($12,327.70, as indicated by The Inbal Jerusalem Hotel reservation price quote, which included meals), the airline tickets for Sigal, her aide and her mother on El A1 Airlines ($15,395.91, as indicated on the travel agent’s invoice, No. 0000129556) and the wheelchair-accessible van, all extraordinary expenditures predicated upon Sigal’s physical condition and personal needs. Thus, it appears that the total cost of the airfare and hotel is $27,723.61, for Sigal, her aide and her mother (airfare only) based upon the airfare and hotel invoices; no proof of payment of these particular items has been furnished to the court, nor has any proof been submitted as to the actual cost and payment for the van. A “final bill” was forwarded to the court by the guardians’ counsel’s legal assistant on October 2, 2013, which indicated a payment of $31,654.13 for “Accessible Van Rental/ Tour Guide and Hotel for Israel Trip.” However, there were no invoices or paid bills explaining that payment. Consequently, in view of the fact that this court’s order of December 18, 2006 (Asarch, J.) permitted the disbursement of up to $20,000 a year for a family vacation, the court authorizes the withdrawal and reimbursement from the guardianship account for calendar year *390 2013 the sum in excess of $20,000 which equals the total cost incurred for the hotel accommodations and airfare for Sigal and her aide, the airfare for Jordana M., and the wheelchair accessible van.
The court declines to permit the additional withdrawal from Sigal’s guardianship account to pay for the cost of the airline tickets, hotel or other vacation expenses (e.g., tour guide) for Si-gal’s three siblings and her father, as well as her parents’ hotel room. To this end, the court admonishes the family that Sigal’s funds “are not community property for family use” (see Matter of Pineda at 852, quoting Caban v Lonkey, 53 Misc 2d 171, 172 [Civ Ct, NY County 1967]). Sigal’s funds must be “available for [her] support and medical needs during the full span of [her] life expectancy. The future is always uncertain; medical conditions may be exacerbated, recessions may devaluate investments, and inflation increase the cost of necessities” (Matter of Pineda at 855). The family should not look to Sigal to pay for their own vacation, or for any other needs not required by Sigal. The family is reminded that these funds inured to Sigal solely as compensation from the tragic and unforseen circumstances forced upon her own life. Therefore, this court sua sponte directs that the co-guardians must in the future seek prior approval from the court before incurring any extraordinary expense on behalf of Sigal M. which was not specifically delineated and directed by Judge Asarch in his previous orders.
Accordingly, the guardians’ oral application for an order authorizing the guardians to withdraw from the infant guardianship account a sum in excess of $20,000 for a family vacation for calendar year 2013 is granted to the extent that the amount of $27,723.61 is permitted to be immediately disbursed to them from Sigal’s guardianship account; a further order will issue with respect to the reimbursement of the cost of the wheelchair-accessible van upon proper proof.

. Extraordinary expenses Judge Asarch permitted to be withdrawn pursuant to his December 18, 2006, order included gifts to family members (not to exceed $500 per family member in a calendar year); medical and educational therapies (not to exceed $740 per month); therapeutic trips taken for Sigal’s benefit, including (up to $10,000 per year) regular professional cleaning and replacement of Sigal’s clothes; adaptive toys and equipment for the exclusive use of Sigal, and maintaining, fueling and insuring Sigal’s wheelchair-accessible motor vehicle.

. E.g., on February 14, 2010, and July 11, 2012, Judge Asarch authorized the expenditure of $1.12 million from the guardianship account towards the purchase, construction and renovation of the guardians’ real property for the purpose of accommodating Sigal’s personal and physical needs.

. See Laurie Goodstein, Bar Mitzvahs Get New Look to Build Faith, NY Times, Sept. 4, 2013 § A at 1; Ralph Gardner Jr., Bash Mitzvahs!, NY Mag, Dec. 2008 (“bar mitzvahs are grander than weddings — weddings often end in divorce, but bar mitzvahs last forever”).

. Sigal received bat mitzvah presents in the form of jewelry and other nonliquid gifts instead of the usual custom of giving money to acknowledge the happy occasion.

. This court declines to follow the “best interests” standard adopted last year by a Court of Claims judge to circumvent the “artificial boundary” created by the “standard principles,” and to permit the use of settlement proceeds (from a medical malpractice action against a state hospital) to pay for the necessities in the life of a severely and permanently disabled infant (see Joyner-Pack v State of New York, 38 Misc 3d 903, 914-915 [Ct Cl 2012]).