[992 NYS2d 612]

Nyrell Joyner-Pack, an Infant, by His Mother and Natural
Guardian, Ivy Joyner, Claimant, v State of New York,
Defendant. (Claim No. 116582.)

Court of Claims, July 9, 2014

## APPEARANCES OF COUNSEL

*Fitzgerald & Fitzgerald, P.C. (John Daly* of counsel) for claimant.

*Eric T. Schneiderman, Attorney General,* for defendant.

## OPINION OF THE COURT

DAVID A. WEINSTEIN, J.

The present application arises out of an action brought by Ivy Joyner (IJ) on behalf of her infant son Nyrell Joyner-Pack (NJP), alleging medical malpractice in the immediate postnatal care received by the latter, leading to severe physical and mental deficits. By decision and order dated December 3, 2012, I approved the settlement of this matter under article 12 of the CPLR, via an infant compromise order (ICO) (*Joyner-Pack v State of New York*, 38 Misc 3d 903 [Ct Cl 2012]). IJ now moves

to make withdrawals from the settlement fund created by the ICO beyond those permitted thereunder.

NJP is now 12 years old, and lives with his mother and 23-year-old sister in a two-bedroom apartment in Brooklyn, New York. He is wheelchair-bound and (according to his mother's affidavit) "will need lifelong care and constant supervision" (IJ aff ¶ 4).

Under the ICO, claimant received $2 million for pain and suffering. Those funds were to be allocated as follows: $915,359.88 were deposited in the Hudson Valley Bank, N.A., to fund a managed settlement trust (the trust), $800,000 were used to fund periodic structured settlement payments, and the remainder went to pay attorneys' fees and costs. In addition, I approved NJP's placement in the Medical Indemnity Fund (MIF), which ensured that his medical expenses would be paid out of that fund.[1]

In regard to the money held for the infant's benefit, I approved the use of $2,000 per month for the infant's care and maintenance; $1,000 per month (adjusted 3% per annum) paid to IJ for services she rendered in caring for claimant; $500 quarterly to pay for NJP's clothing and shoes; and $72,000 for an automobile and the cost of car insurance. I noted that certain of these payments were at odds with what generally may be taken from an infant's funds. Nevertheless, I approved them based on the following reasoning, set forth in the decision and order:

> "Claimant Nyrell Joyner-Pack is, and so far as the medical reports before me indicate will forever remain, entirely dependent on his family or on institutional caregivers for every aspect of his life. He cannot use language, nor move about on his own, nor feed himself, nor live in a manner that is any way independent of those around him. He is, the medical submissions attest, at the developmental level of an four-month-old child. Moreover, his 'qualifying medical costs' will be provided for via the MIF. Under these circumstances, I find that use of the settlement proceeds to provide for the necessities of Joyner-Pack's life (and to do so in as

---

1. In accordance with Public Health Law § 2999-j (14), the statute governing the MIF, the settlement agreement also provided for a notional $2 million in "Fund damages," which amount was used solely to calculate payment of additional attorneys' fees directly by defendant (*see Joyner-Pack*, 38 Misc 3d at 904). As discussed below, the total award for fees and costs was $559,640.12.

comfortable a manner as possible), and to aid his family in caring for him in his home, is in claimant's best interests. To preclude the use of settlement assets for these purposes, in order that they will be available to claimant when he reaches the age of majority or some other, undisclosed purpose is to draw a wholly artificial boundary. When claimant turns 18, the evidence before me indicates he will remain in the same developmental state as he is at present, and the potential uses for the settlement assets will be subject to the same practical limitations.

"Under these circumstances, and given the extraordinary responsibility claimant's mother faces in providing him with care, some greater leeway is warranted so that his parent and guardian may make use of the settlement fund to provide for her son, and to mitigate the great difficulties presented by claimant's state" (*Joyner-Pack*, 38 Misc 3d at 914-915).

The ICO prohibited any further withdrawals without leave of the court.

NJP also entered into a settlement of a companion action filed against various physicians in New York State Supreme Court. That case had settled in 2009 for $1.25 million, and an ICO was approved on November 18, 2010. According to claimant's present submission, those funds were used to settle liens regarding Medicaid and held by other social service providers, to establish a supplemental needs trust, and to fund an annuity (*see* Daly aff ¶ 12). This court has confirmed, as part of its review of the present application, that claimant has not sought to withdraw funds from that settlement.

On April 28, 2014, IJ made the present application, requesting further payments out of the funds reserved for NJP. The application is supported by the affirmation of claimant's attorney, John Daly, and IJ's own affidavit.

Specifically, IJ seeks the to use the following funds from her son's settlement:

- $265,000 for the purchase of a new home in East Stroudsburg, PA. Title to the home will be held by the trust.

- $15,000 for closing costs on the home.

- Annual payment of real estate taxes, homeowner's association fees and homeowner's insurance on the new house. The former two items are estimated at $14,306.94 and $1,080 per annum, respectively. No estimate is provided for insurance.

- Up to $10,000 for new furniture for the home.

- Payment of up to $7,500 for purchase and installation of a generator, which IJ states is necessary for the new home, since she "cannot afford to lose power" given NJP's condition.

- Up to $2,500 in moving expenses.

- An increase from $1,000 to $2,000 in the monthly "earned income" payment to IJ for the care of her son.

In IJ's affidavit, she states that her monthly income, including the money she receives from this settlement, plus various government benefits, totals $4,298 (IJ aff ¶ 13). Her monthly expenses are presently $3,080 (IJ aff ¶ 14). The market value of the trust, at the time this application was filed, was $838,160.46.

IJ attests that she has "thoroughly researched" the services in the town where her intended home is based, and has found that NJP has full access to "all his needed therapies and schooling" there (IJ aff ¶ 20). She further notes that while the home will reduce the trust's cash balance, it will remain an asset held by the trust (IJ aff ¶ 25).

## Discussion

As a general rule, a child's recovery in a lawsuit "is intended to recompense him for the physical handicaps and personal suffering the defendant visited on him and to place him on a more equal footing with [other] persons not injured . . . and is not a resource available for his basic support" (*Baker v Sterling*, 39 NY2d 397, 413 n 3 [1976, Fuchsberg, J., concurring] [citations omitted]). Thus, such settlement funds are generally not to be used "for ordinary necessities of life" (*see Galante v Doe*, 68 Misc 2d 295, 297 [Civ Ct, Kings County 1971] [citation omitted]; *DeMarco v Seaman*, 157 Misc 390, 391 [Sup Ct, Queens County 1934]; *see also Zambrana v Railway Express Agency*, 11 Misc 2d 553, 554-556 [Sup Ct, NY County 1956] [an order allowing the withdrawal of money "must mean something more than just giving over the infant's property . . . which constitutes legal replacement for his loss, to the one who in law is responsible for his support"]).

In recent years, though, courts have retreated from a blanket prohibition on withdrawal to assist the parent in providing the standard elements of a child's care. Thus, the Appellate Division has opined that while withdrawals from an infant's settlement fund before he reaches the age of majority must be strictly policed, their use "for necessities and education" may be allowed, but "only to the extent [they] cannot otherwise be provided" (*Matter of Dagani*, 226 AD2d 197, 199 [1st Dept 1996], quoting *Ahders v Southampton Hosp.*, 90 AD2d 508 [2d Dept 1982]). Expenses allowed pursuant to that exception must be based on a showing of financial inability, premised on detailed information demonstrating that each particular expense is not within the parent's means (*see Matter of Pineda*, 168 Misc 2d 845, 848-850 [Sup Ct, NY County 1996] [hereinafter *Marmol*]; *Gaffney v Constantine*, 87 NYS2d 131 [Sup Ct, Queens County 1949]).

Further, while the relevant regulations forbid withdrawal of settlement funds "except for unusual circumstances," that is the case only "where the parents are financially able to support the infant and to provide for the infant's necessaries, treatment and education" (22 NYCRR 202.67 [g]). Since this rule allows for withdrawal to pay for infant support in cases of financial hardship, it represents a "departure" from earlier case law holding that "the child's personal injury recovery was so inviolable that only extraordinary expenses justified withdrawals," now permitting withdrawals for infant support, albeit "only upon clear proof that such is justified by the financial circumstances of the family" (*Marmol*, 168 Misc 2d at 850).

In applying these standards, I note that the court retains discretion in how to oversee infant funds (*see Matter of Curry*, 128 Misc 2d 760, 764 [Sup Ct, Dutchess County 1985]). Moreover, I reiterate my prior observations regarding the "unusual circumstances" of this case. In particular: (1) the infant claimant suffers a severe level of impairment that will limit many of the potential uses of his assets for his benefit even when he reaches adulthood, and (2) many of the expenses which will be needed on his behalf throughout his life will be paid out of the MIF. Indeed, the fund will cover "medical, hospital, surgical, nursing, dental, rehabilitation, custodial, durable medical equipment, home modifications, assistive technology, vehicle modifications, prescription and non-prescription medications," and other medical costs (*see* Public Health Law § 2999-h [3]). While enactment of the MIF did not overrule prior law regard-

ing use of infant settlement funds, I cannot ignore, in assessing the ability of the settlement fund to cover the infant's expenses for life, that under the settlement the basic costs of NJP's care will be provided for at state expense. At the same time, neither statute, regulation nor case law allows the use of infant funds for family expenses which are of no benefit to claimant.

With these principles in mind, I proceed to address the specific requests set forth in claimant's application.

The House

Over and above the general standards set forth above, when a parent seeks to withdraw an infant's recovery to purchase a family home, courts have also looked to the seven factors set forth in *Marmol* to determine whether such use of funds is appropriate (*see Matter of Ferraiola*, NYLJ, Jan. 26, 2005, at 36, 2005 NY Misc LEXIS 8189 [Sur Ct, Westchester County 2005] [applying *Marmol* factors]; *Alteon v State of New York*, Ct Cl, Dec. 5, 2000, Read, P.J., UID No. 2000-001-081 at n 3 [same]). Specifically, *Marmol* provides as follows:

> "[T]he use of infants' funds for the purchase of a family home will be judicially authorized provided: (1) by clear proof the parents show they cannot afford the purchase price or a portion thereof; (2) the house has features beneficial to the child and accommodates his physical limitations; (3) the purchase price is fair; (4) title is vested in the child at least to the proportionate degree of his investment in the house; (5) necessary measures are taken, where needed, to safeguard the investment against the profligacy of the parent; (6) parents offer a *quid pro quo*; and (7) the funds remaining after the outlay are sufficient to meet the future needs of the infant and where the child is expected to remain incompetent, for the anticipated duration of his life" (*Marmol*, 168 Misc 2d at 853-854).

In this case, claimant has submitted evidence that the family's limited income of about $4,000 per month would, at the very least, make the purchase of such a home extremely burdensome, absent use of the infant's funds (*see id.* at 853, discussing *Matter of Genco*, NYLJ, Feb. 8, 1984 at 15, col 5 [Sur Ct, Nassau County 1984] [allowing infant funds to be used to purchase home in infant's name, where use of parents' funds would deplete them financially]). Moreover, IJ sets forth in her affirmation the limited space available to the infant claimant in his current living quarters, and the degree to which that space will

be greatly expanded to his benefit in the new abode (*see Matter of Christopher W.*, NYLJ, Mar. 26, 1991 at 25, col 3 [Sur Ct, Bronx County 1991] [allowing infant funds to be used for purchase of new home so that incompetent 19 year old could escape cramped quarters]). She also submits an appraisal that was conducted on the house on February 6, 2014, which found the value of the house to be the purchase price of $265,000 (application exhibit 12). Title to the property is vested in NJP's trust. And since the expenditures IJ asks to be authorized are limited by specific dollar amounts (except as addressed below in regard to insurance), the petition does not allow for profligacy. Thus, the first five factors of the *Marmol* test are met.

The case law is not altogether clear as to the meaning of the "quid pro quo" factor. In *Ferraiola*, however, the court found this factor satisfied by a proviso in the application that the funds would be returned to the child's possession in the event the sale of the house did not close. The court's order in this case will provide ths same condition.

Finally, after the purchase, claimant will still retain over $500,000 in the trust account even after the initial annual payments authorized by this order are deducted, as well as the periodic structured settlement payments, along with the funds in the trust from the supreme court action (*cf. Serrant v Mossi*, 40 Misc 3d 1224[A], 2013 NY Slip Op 51298[U], *2 [Sup Ct, Bronx County 2013] [denying application for withdrawal of funds that would leave infant with "only $993.45"]). Moreover, all of NJP's therapeutic needs will be covered by the MIF, to the full extent provided for by law, as the family's move to Pennsylvania will not impact their legal entitlement to payments under the fund (*see* Department of Health Regulations [10 NYCRR] § 69-10.22 [a], as added by emergency rulemaking eff. May 23, 2014 ["Eligibility for or continued enrollment in the Fund is not dependent on the current or past residence of a qualified plaintiff or enrollee"]; § 69-10.1 [v] [defining covered physician to include one licensed outside New York State]). Thus, the withdrawal of funds for this purpose leaves NJP with adequate funds for future care.

In light of the foregoing, I find that the purchase satisfies the *Marmol* factors, and I grant the petition in this regard. The fact that other family members will also benefit from the new home does not warrant disapproval (*see Marmol*, 168 Misc 2d at 851).

The petition also seeks certain ancillary costs relating to the purchase of the home: closing and moving costs, real estate

taxes, homeowner's insurance, and the cost of a generator (since NJP's condition requires protection against a power outage). Since the moving costs and generator are all part and parcel of a new home purchase, and there is no indication that they are at all unusual or unreasonable, I grant the application in this regard as well (*see Matter of Amanda M.D.*, NYLJ, Aug. 6, 2008, at 34, 2008 NY Misc LEXIS 5011 [Sur Ct, Bronx County 2008] [approving use of infant's funds for moving costs as part of approving home purchase]).[2] Given that there is no ceiling on the costs to be paid for homeowner's insurance, I direct that this amount be reasonable following a sufficient market search, and that the claimant submit to the court a receipt showing the cost of any payment made in this regard, and shall report to the court in the event that she has altered the scope of her coverage, or the carrier providing it, at any time thereafter.

Furniture

The application seeks $10,000 to purchase furniture for the new home, comprised of a "seven piece sectional, sofa, chaise, recliner, kitchen set, three piece sectional, lava rug and five piece dining room" (Daly aff ¶ 34). The only explanation given for this purchase is that the family's present furniture is "old" (IJ aff ¶ 30). No information is provided as to how this furniture will benefit NJP. Indeed, given his significant physical disabilities, it is not clear how he could make use of any of it.

While I am sympathetic to the family's desire to outfit its home appropriately, and to have new furniture in a new residence, and notwithstanding the unique circumstances of NJP's petition, I cannot see how this expense is permissible under any reading of the relevant law. I therefore deny the application in this regard.

Increase in Monthly Payment

IJ seeks an increase in the payment she receives for caring for her son from $1,000 to $2,000 per month. The application does not detail why this is necessary, or why such amount was not sought on the original application. Indeed, her affidavit shows that she has adequate funds to meet monthly expenses. The supporting affirmation by counsel states that IJ will have increased expenses in her new home, but does not say what

---

2. While claimant now pays $1,500 in rent, only $424 of that is out of pocket, as she receives a section 8 subsidy for the remainder, which will no longer be available. Since those out-of-pocket expenses are not sufficient to meet the monthly costs of the new home, I will allow that expense to be met out of the infant's funds.

they are, or why they are not covered by the other items for which reimbursement has been approved above. In fact, it appears her expenses will be reduced, since she will no longer need to cover rent, currently (after deducting her section 8 subsidy) $424 per month (*see* IJ aff ¶ 14).

I therefore deny the application in this regard.

Attorneys' Fees

The application also seeks reimbursement for the cost of her attorneys in bringing this application. It estimates the costs of such as follows:

• 10 hours of paralegal time assembling documents, at a cost of $125 per hour ($1,250);

• 15.75 hours of associate time spent "reviewing and revising the draft, with telephone time and other matters," at $275 per hour ($4,331.25); and

• 8.5 hours of partner time at $350 per hour ($2,975). (Daly aff ¶ 46.)

The total costs of attorney time, by these estimates, is $8,556.25. Nevertheless, and without elaboration, the application states: "Rather than charge a fee based upon an hourly rate, the Law Offices of John Daly is seeking a fee of $9,500.00" (Daly aff ¶ 47).

██ The supporting affirmation does not explain why the trust should use the infant's funds to compensate counsel for an amount more than 10% *above* the firm's customary hourly rate for the time involved. It is deeply concerning, moreover, that such an increase is sought without any indication that counsel is doing so, and without justification.

In any case, payment from the trust of fees of this scope is wholly unwarranted. While there is little law on this issue, there is some indication that an infant's settlement proceeds may be used, when funds are otherwise unavailable, to pay a reasonable attorney's fee when needed for a withdrawal application (*cf. Matter of A.C.*, 16 Misc 3d 1119[A], 2007 NY Slip Op 51478[U], *5 [Sup Ct, Bronx County 2007] [rejecting application for $7,500 in attorneys' fees for application regarding amendment to ICO that was partially granted, but indicating that "reasonable fees" would be awarded upon application for services rendered]; *but see Pena v Bronx-Lebanon Hosp. Ctr.*, 2008 NY Slip Op 33682[U], *4 [Sup Ct, Bronx County 2008] [rejecting "an exorbitant $8,125 compensation in attorney fees"

in connection with application to withdraw funds from account established by an ICO, where attorney failed in several efforts to provide necessary documentation]). And while some compensation of counsel is necessary to ensure that an ICO amendment may be sought when it is truly necessary, the court's duty to protect an infant's funds is of particular importance in this regard, where the money does not go directly to benefit the infant.

In this case, counsel received a fee award for handling this matter in the amount of $559,640.12, for work that included preparation of the initial ICO application. Counsel provides no explanation as to why the matters now before me (i.e., funds for a future home purchase) could not have been addressed at that time. Moreover, permitting counsel to receive full reimbursement at standard rates (indeed, at above such rates), would make it worthwhile for an attorney to withhold permission for various expenditures from the ICO, and then seek additional approval, for which it could receive compensation at the expense of the infant's funds, and above the statutory limits applicable to a malpractice action (*see* Judiciary Law § 474-a). Finally, it is unclear why the amount of time cited was required for an application consisting primarily of factual averments, with no legal analysis at all.

Under these circumstances, but given that counsel's time was expended on a largely successful application, I will approve a fee award of $2,000.

Other Matters

Lastly, I note one potential matter of concern. The application indicates that a down payment was made on the house of $20,000 in January 2014, on condition that it be returned in the event the contract was not approved by the court (Daly aff ¶ 22). Approval was then sought for the purchase reflected in that agreement over three months later. Although the affidavit does not clearly identify the source of the funds, it would appear—since the home is being purchased by the trust—that the money came out of that trust.

To be clear, the ICO does not allow the claimant to spend funds "conditionally," and then seek leave after the fact. While, in light of the present order, the use of the funds has ultimately been approved, the applicant is cautioned that no money may be spent out of the trust without a court order, regardless of whether this is done upon particular conditions, or is to be returned per some agreement in the event the court does not approve.

## Conclusion

In light of the foregoing, it is ordered that withdrawals from the trust created by the ICO in this action are approved as follows:

Claimant's application to the extent that it seeks withdrawal of $265,000 for purchase of a home by the trust; the cost of real estate taxes and homeowner's association fees; the reasonable cost of homeowner's insurance provided that a copy of the policy and receipt for initial annual payment are provided to the court, and leave is sought in the event there is any change of carrier or coverage at greater cost; and an amount not to exceed $7,000 for the cost of a generator and $2,500 for moving costs. In regard to the moving expenses and generator, proof of such costs shall be provided to the court, and any remainder shall be kept in the trust.

In the event the sale of the home does not close, any funds whose withdrawal is authorized by this order shall be returned to the trust account.

The application is denied to the extent it seeks the costs of furniture, and an additional monthly allowance for Ivy Joyner. The application for attorneys' fees is granted to the extent a fee of $2,000 may be paid to claimant's counsel from the trust.